MERRITT, J., delivered the opinion of the court in which STRANCH, J., joined. MOORE, J. (pp. 426-32), delivered a separate dissenting opinion.
OPINION
MERRITT, Circuit Judge.
Defendanb-Appellee Justin Schlabach, an officer of the Munising Police Department, shot and killed Timothy Mitchell (“Mitchell”) following a lengthy and dangerous car chase. The crucial facts at the scene of the shooting were recorded on the officer’s dashboard camera, and our decision in this case turns in large measure on this evidence. Plaintiff-Appellant Ronald Mitchell filed this § 1983 suit against Schlabach on behalf of Mitchell’s estate seeking damages for Schlabach’s alleged violation of Mitchell’s light to be free from excessive force under the Fourth Amendment. Schlabach moved for summary judgment on the basis of qualified immunity, and the district court granted his motion. For the reasons articulated below, we AFFIRM the judgment of the district court.
I. Background
Since this is an appeal from an award of summary judgment, we view the facts in the light most favorable to the non-moving party—here, Mitchell’s personal representative. Coble v. City of White House, 634 F.3d 865, 868 (6th Cir. 2011). We also draw all reasonable inferences in his favor. Id. However, we do not accept Plaintiffs facts to the extent that they are “blatantly contradicted by the record.” Id. (quoting Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)) (internal quotation marks omitted). There is no serious dispute about the facts of this case because a camera on the officer’s dashboard captured most of the relevant event. What follows is an account of the facts in the light most favorable to the Plaintiff.

A. Factual Background

On July 14,2014, the 911 dispatch center in Alger County, Michigan received a re *419 port that “Tim Mitchell” had assaulted another individual named Kevin and that he was “headed towards Christmas,” Michigan. The caller stated that Mitchell had been drinking and was “swerving all over the road.” The dispatcher then contacted Schlabach—the only officer on duty at the time—and notified him that Mitchell was “pretty intoxicated” and had been “involved in a verbal altercation.”
Schlabach identified Mitchell’s car on a highway and followed it into a parking lot. Mitchell brought his vehicle to a stop in the parking lot, and Schlabach made a show of authority by pulling his police cruiser up to the driver’s side of Mitchell’s car. As soon as Schlabach came to a stop, Mitchell sped back onto the highway in an effort to evade arrest. Schlabach pursued Mitchell as he careened through residential neighborhoods, around cars, and through stop signs. Large portions of the chase involved Mitchell traveling at speeds in excess of 100 miles per hour. Inclement weather made the chase even more treacherous as it was pouring rain throughout the entirety of the pursuit. At one point, Mitchell “slammed on the brakes,” which Schlabach interpreted as an attempt to either “ram [him], or get [him] to break off th[e] pursuit.” Schlabach requested backup at several points, and the dispatcher confirmed that at least two officers were en route to provide assistance.
Ten minutes into the car chase, Mitchell ran his car into a roadside ditch in the middle of a national forest. Schlabach parked his car 63.6 feet from Mitchell’s car, where he assessed the situation “to see what’s [Mitchell] doing next, where’s he gonna go, does he have a weapon, what’s going on, is the vehicle in [sic] fire.” Mitchell exited the car, looked toward Schlabach’s vehicle, and then turned away while he pulled up his pants and crouched toward the ground. Mitchell appeared to be unarmed when he left his vehicle, and Schlabach did not observe anything indicating that Mitchell had a weapon.
Schlabach exited his vehicle into the pouring rain, drew his handgun, and began slowly approaching Mitchell. Schlabach claims that he gave loud, verbal commands as he approached Mitchell: “Stop, get down, get down on the ground, get down on the f-ing ground.” In response, Mitchell turned around and began walking toward Schlabach. Schlabach described Mitchell as walking “aggressively”—that is, with “[c]lenched fists, wide eyes, coming directly in my—towards me, ... refusing to listen to any of my direct commands.” And while the dash-cam video does not clearly show Mitchell’s facial expressions or whether his fists were clenched, it leaves little room to doubt the hostility of Mitchell’s approach. Indeed, Mitchell headed straight toward Schlabach with long, purposeful steps despite the fact that Schla-bach was pointing a gun directly at him. Mitchell continued toward Schlabach even after Schlabach began backing away in fear. Schlabach stated in a deposition that while Mitchell was approaching him, “He told me I was gonna have to f- - -ing shoot him,” which Schlabach took to mean, “if I didn’t shoot him, he was gonna kill me ... [w]ith his fists, with his feet, with my gun, with anything he possibly could’ve gotten at the time.”
Schlabach took five hurried steps backward in an attempt to keep distance between himself and Mitchell. After Mitchell had pressed Schlabach all the way across the road and the gap between the two had narrowed to “somewhere between 10 and 21 feet,” Schlabach fired a shot at Mitchell. Mitchell hunched over slightly, but continued moving purposefully toward Schla-bach. Less than one second after firing the first shot and after taking two more steps back, Schlabach fired again. After the sec *420 ,ond shot, Mitchell hunched over further and turned around. He staggered for several' steps back toward his vehicle before collapsing to the ground. Schlabach then holstered his weapon and handcuffed Mitchell. After running to turn off his siren, Schlabach returned to see if Mitchell ■ still had a pulse. An autopsy later confirmed that Mitchell died from the two gunshot wounds inflicted by Schlabach.
Before proceeding with our analysis, we note that the situation escalated rapidly .from the time Schlabach exited his car to the time he shot Mitchell. While we needed two paragraphs to describe what happened during the intervening time, it all unfolded in less than twenty seconds.- In such situations, we are admonished to make an “allowance for the fact that police officers are often forced to make split-second judgments” when we review their actions for purposes of qualified immunity. Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

B. Procedural Background

. Ronald Mitchell, the personal representative of the decedent Mitchell’s estate, filed a complaint under 42 U.S.C. § 1983, alleging that Schlabach violated Mitchell’s Fourth Amendment rights when he “unlawfully seized and used unnecessary, unreasonable, excessive, and deadly force against” Mitchell. Schlabach then filed a motion for summary judgment, arguing that he was entitled to qualified immunity and that he did not violate Mitchell’s civil rights. The lower court granted Schla-bach’s motion, finding that Schlabach was entitled to qualified immunity both because the facts did not amount to a constitutional violation and because any right that Schlabach might have violated was not “clearly established” at the time of the shooting.
This appeal followed.
II. Discussion
Plaintiff argues on appeal that the district court committed two reversible errors when it granted Schlabach’s motion for summary judgment: First, Plaintiff contends that the lower court wrongly held that the allegations in his complaint did not rise to the level of a constitutional violation. Second, Plaintiff argues that the lower court erred in holding that the constitutional right in question was not “clearly established” at the time of the shooting. Because we agree with the district court’s conclusions on both issues, we affirm the judgment of the district court.
We review an award of summary judgment-on the basis of qualified immunity de novo. Clay v. Emmi, 797 F.3d 364, 369 (6th Cir. 2015). As discussed above, we view the facts in the light most favorable to the 'plaintiff and draw all reasonable inferences in his favor. Coble, 634 F.3d at 868.
The doctrine of qualified' immunity protects “government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Miller v. Sanilac Cty., 606 F.3d 240, 247 (6th Cir. 2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To determine whether a defendant is entitled to qualified immunity, we ask two questions: “First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right, clearly established at the time of the violation?” Id. Government officials are protected by the doctrine of qualified immunity unless the answer to both questions is yes. See id.

*421
A. Has Plaintiff Shoum a Constitutional Violation?

We first ask whether, viewing the facts in the light most favorable to the Plaintiff, Schlabach’s use of deadly force violated the Fourth Amendment’s requirement of reasonableness. Mullins v. Cyranek, 805 F.3d 760, 765 (6th Cir. 2015) (citing Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014)). We hold that it did not.
While the ultimate determination of reasonableness must be based on the totality of the circumstances, this court has repeatedly found three factors to be helpful in excessive force cases: “(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.” Id, (quoting Sigley v. City of Par-ma Heights, 437 F.3d 527, 534 (6th Cir. 2006)) (internal quotation marks omitted). We are admonished not to assess those factors from a distance, but rather to consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” Id. at 765-66 (quoting Graham, 490 U.S. at 396-97,109 S.Ct. 1865). -
Mitchell’s' crimés were severe. He was first reported to the police for driving drunk after' provoking an altercation with another individual. The severity of his crimes increased once Schlabach arrived on the scene. Mitchell immediately—and presumably still under the influence—began to flee from Schlabach.' During the course of the ten-minute-long chase, Mitchell traveled through residential neighborhoods at dangerous speeds far exceeding posted limits and . passed several vehicles on the highway at speeds in excess of 1QQ miles per hour; In doing, so, •Mitchell knowingly placed himself, Schla-bach, and the public at risk of, severe injury or death., Had Mitchell survived, he likely would have been charged with several serious crimes under Michigan law. See Mich. Comp. Laws Ann. § 257.626 (reckless driving); id. § 257.625 (driving while intoxicated); id. § 750.479a (fleeing and eluding arrest). The seriousness of these offenses, is underscored by the fact that the latter two are felonies under the Michigan Penal Code. See Mullins, 805 F.3d at 766 (implying that a .crime’s status as a felony is an indication of its seriousness). Thus, we find that the severity factor weighs in favor of a finding of reasonableness.[1]
Mitchell also posed, a serious threat to Schlabach’s safety. Mitchell’s personal representative alleges that Mitchell was simply “walking” toward Schlabach “with his hands at his sides” and “no weapon in [his] hands” when Schlabach shot him. Mitchell’s representative further denies that Mitchell was “rushing, running, or charging” toward Schlabach when he was shot. We disregard those allegations, howevér, because they are “blatantly contradicted by the record.” Coble, 634 F.3d at 868 (quoting Scott, 550 U.S. at 380, 127 S.Ct. 1769) (internal quotation marks omitted). The available video footage clearly shows that Mitchell approached Schlabach at more than a walking pace. Indeed, he moved toward Schlabach with speed, purpose; and confidence despite the fact that Schlabach had a gun trained on him. Mitchell continued charging toward Schla-bach even as Schlabach changed trajecto- *422 ríes and began backing away from him. We note that Mitchell’s verbal threats were unrecorded but that Schlabach testified that Mitchell said that Schlabach would “have to ‘f- - -ing shoot [him].’ ” The video evidence corroborates that testimony because it makes clear that Mitchell intended a confrontation with Schlabach. By the time Schlabach discharged his weapon, Mitchell had already pressed him back across the road and had narrowed the gap between them considerably. If Mitchell had continued any further, Schlabach may not have had enough time to react without a violent confrontation. The same analysis applies to Schlabach’s second shot since Mitchell continued charging toward Schla-bach even after the first shot; it was only after Schlabach fired the second shot that Mitchell recoiled and began to retreat. Taken together, these facts all indicate that Schlabach had “probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury” when he fired both shots. Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
While it is beyond question that “[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead,” it is also clear that Mitchell was something more than a “nondangerous suspect.” Id. at 11, 105 S.Ct. 1694. As discussed above, the available evidence readily establishes that Schlabach reasonably believed that he was in danger of serious physical harm when he shot Mitchell. We therefore will not “second-guess[ ] [Schlabach’s] assessment, made on the scene, of the danger presented by” Mitchell’s approach. Ryburn v. Huff, 565 U.S. 469, 477, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (per curiam). Accordingly, we find that the seriousness-of-the-threat factor also weighs in favor of a finding of reasonableness here.
Finally, Mitchell was resisting arrest when he was shot. After crashing his car at the conclusion of a high-speed car chase, Mitchell began to charge an officer who was pointing a firearm at him. These circumstances alone support the conclusion that Mitchell was resisting arrest. And while it is true that we cannot see Mitchell’s facial expression as he approached or whether his fists were clenched, the only reasonable inference from the available evidence is that Mitchell did not intend to submit to arrest peacefully. Even drawing all available inferences in favor of the plaintiff, we conclude that Mitchell was actively resisting arrest at the time he was shot. Accordingly, the third factor also supports a finding of reasonableness here.
And while each of the factors above supports a finding of reasonableness, the ultimate question under the first prong of the qualified immunity analysis in this case is whether Schlabach’s decision to use deadly force against Mitchell was reasonable under the totality of the circumstances. Mullins, 805 F.3d at 765 (citing Plumhoff, 134 S.Ct. at 2020). On appeal, Plaintiff points to several circumstances that he claims weigh against a finding of reasonableness.
First, Plaintiff points to Schlabach’s deposition testimony that he did not believe that Mitchell was armed. Plaintiff argues that this concession means that Schlabach could not have reasonably believed that Mitchell posed an imminent threat to his safety. Common sense suggests otherwise. As an initial matter, we note that Schla-bach only testified that he did not believe that Mitchell was armed, not that he knew that Mitchell was unarmed. Indeed, Schla-bach could have reasonably believed Mitchell had a handgun, a knife, or some other weapon concealed on his person. Even if such a belief was unreasonable, a suspect need not be armed to pose an *423 imminent threat to an officer’s safety. Here, Schlabach reasonably feared for his safety despite the fact that Mitchell may have been unarmed—Mitchell’s aggressive approach suggested that he might well have attacked Schlabach with his fists, or that he might have tried to wrestle for control of Schlabach’s gun so that he could use it against the officer. Thus, we find that Schlabach’s testimony is not disposi-tive on the issue of reasonableness
Second, Plaintiff argues that Schlabach’s decision to shoot was unreasonable'in light of expert testimony suggesting that Mitchell might have been as far as twenty-one feet away from Schlabach when he was shot.[2] That evidence, however, is contradicted by the video footage in this case. While the video does not allow for a precise determination of the distance between Mitchell and Schlabach at the time of the first shot, there is no question that Mitchell showed no signs of stopping and that one more step would have placed Mitchell in a position to attack Schlabach with his fists. Based on the record evidence that is not contradicted by the video footage, we hold that the distance between Schlabach and Mitchell at the time of the shooting did not render Schlabach’s decision to shoot unreasonable.
Finally, Plaintiff argues that Schlabach’s application of deadly force was unreasonable because he did not first attempt to use pepper spray or his nightstick to subdue Mitchell. However, this argument ignores the fact that Schlabach faced a rapidly evolving situation when he stopped his car after Mitchell crashed his vehicle. The fact that a situation “unfolds quickly” is not alone sufficient to justify the application of deadly force, but it is a factor that weighs in favor of a finding of reasonableness when it accompanies a credible threat to the safety of an officer or the public. See Mullins, 805 F.3d at 766-67. After being led on a dangerous car chase for more than ten minutes, Schlabach reasonably assumed that Mitchell would do whatever it took to avoid apprehension. As such, Schlabach acted reasonably when he drew his gun upon exiting his vehicle. With his gun already drawn and Mitchell rapidly approaching him, it would have been both impractical and unwise for Schlabach to have holstered his weapon so that he could attempt to use pepper spray or his nightstick against Mitchell. Accordingly, we hold that the fact that Schlabach did not attempt to use less deadly force to subdue Mitchell is insufficient to render his use of deadly force unreasonable under these specific circumstances.
The confrontation in this case was not a typical encounter between a police officer and a defiant suspect. Schlabach, the lone available officer at the time, shot Mitchell during a confrontation in the middle of an unpopulated national forest after Mitchell charged toward him in direct defiance of orders to drop to the ground. The extended, 100-mile-per-hour car chase in the rain that preceded the shooting would have heightened the heart rate, anxiety, and fear of any normal person, police officer or not. The available video evidence makes clear that Mitchell was close enough to pose a substantial threat to Schlabach’s safety at the time he was shot. Even viewing the facts and video in the light most favorable to Plaintiff, we hold that Schlabach did not violate Mitchell’s right to be free from excessive force because his decision to shoot was reasonable under the totality of the circumstances.
*424 To be clear, our decision in this case is largely driven by the available video evidence, which documents most of the relevant events from a helpful angle. If this case turned on Schlabach’s after-the-fact testimony, summary judgment would likely have been inappropriate. Our holding today is based upon the factual context of a car chase involving a single officer, isolated from backup, who was charged by a suspect who had demonstrated a willingness to put lives at risk in order to evade arrest. This decision does not stand for the proposition that deadly force is reasonable or proper whenever a suspect charges an officer or defies an order.
B. Was the Officer’s Action Contrary to Clearly Established Law?
While the previous discussion would be sufficient to justify our decision today, we also consider the second prong of the qualified immunity analysis: whether Schla-bach’s actions were contrary to “clearly established” law at the time he acted.[3] We hold that they were not,
The Supreme Court very recently reminded the lower courts that an officer’s actions are against “clearly established” law for purposes of qualified immunity only when “ ‘existing precedent .,, place[s] the statutory or constitutional question beyond debate.’” White v. Pauly, — U.S. —, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (quoting Mullenix v. Luna, — U.S. —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)). The Court went on to emphasize that courts should not define “clearly established” law “ ‘at a high level of generality.’ ” Id. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Instead, they should look only, to precedents “particularized to the facts of the case”—although, the standard does not require “a case directly, on point.” Id. at 551-52 (quoting Mullenix, 136 S.Ct. at 308; Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted)). The Supreme. Court tells, us that this narrow definition of “clearly established” functions to protect “all but the plainly incompetent or those who knowingly violate the law.” Mullenix, 136 S.Ct. at 308 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).
Here, Plaintiff relies principally upon the Supreme Court’s decision in Tennessee v. Garner and this court’s decisions in Sample v. Bailey and Dickerson v. McClellan as support for his assertion that Schlabach violated Mitchell’s clearly established constitutional rights. However, none of those cases is sufficiently “particularized” to the facts of this case to place the supposed unconstitutionality of Schlabach’s action “beyond debate” because they all involved situations in which the victim did not pose a threat to the shooting officer’s safety.
The decision in Tennessee v. Garner indisputably enshrines the rule that “[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead.” 471 U.S. at 11, 105 S.Ct. 1694. However, that case involved facts much different than the facts of this case. Garner centered upon a police officer’s decision to shoot an unarmed criminal suspect *425 as he was attempting to flee from the scene of a robbery on foot. Id. at 3-4, 105 S.Ct. 1694. The police officer testified that he shot the suspect because he was convinced that the suspect would have eluded capture otherwise. Id. at 4 n.3, 105 S.Ct. 1694. Based on those facts, the Supreme Court determined that the police officer had violated the suspect’s clearly established constitutional right to be free from excessive force because the suspect was unarmed and did not pose a danger to the officer or the public. Id. at 11, 105 S.Ct. 1694. If Mitchell had fled into the forest, Garner would be on point. However, Mitchell was not attempting to flee from Schlabach when he was shot; he was doing exactly the opposite—charging toward the officer. To hold that a case instructing officers on the unconstitutionality of shooting a fleeing suspect is instructive in a situation in which the officer is being charged by an unarmed suspect strains reason. To that end, any reliance on Garner as support for the claim that Schla-bach violated Mitchell’s clearly established rights is misplaced because it would require us to define the rights at issue at too high a level of generality. See al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074.
Plaintiffs reliance upon this court’s decision in Sample v. Bailey, 409 F.3d 689 (6th Cir. 2005), is similarly misplaced. The case in Sample arose from a police officer’s decision to shoot an unarmed suspect who was discovered hiding inside a cabinet in a building that he had attempted to burglarize. Id. at 691-92. The officers ordered the suspect to come out of the cabinet with his hands visible. Id. at 693-94. As the suspect attempted to use one of his hands to pull himself out of the cabinet, one of the officers shot him. Id. at 692-95. This court first held that the officer’s conduct violated the suspect’s rights since the Shooting officer lacked probable cause to believe that the suspect’s movement posed a threat to his safety or the safety of his' colleagues. Id. at 697-98. The panel went on to hold that the rights violated were “clearly established,” reasoning that our previous precedents provided the officer with adequate notice that shooting a criminal suspect is unreasonable “unless the suspect poses a perceived threat of serious physical harm to the officer.” Id. at 699. The facts here'are distinguishable. Unlike the suspect in Sample, Mitchell actively ignored Schlabach’s commands to “get on the ground” as he continued charging toward Schlabach. An officer in Schlabach’s shoes could reasonably have perceived Mitchell as a threat to his safety. Accordingly, Sample’s rule against the application of force when a suspect does not pose a threat.to an officer’s safety was insufficient to put Schlabach on notice of the constitutionality of his actions when the suspect did pose such a threat.
Finally, the- Plaintiff relies on this court’s decision in Dickerson v. McClellan, 101 F.3d 1151 (6th Cir. 1996), as authority for the idea that Mitchell did not pose a threat to Schlabach’s safety because he was walking with his hands by his sides when he was shot. In Dickerson, we considered an officer’s appeal from the lower court’s denial of summary judgment on the basis of qualified immunity in a case involving a police shooting. Id, at 1154. The evidence in that case suggested that two police officers had been dispatched after neighbors reported that Dickerson. was drunk, and had .fired nine shots inside his home. Id. at 1154. After the officers entered the home, Dickerson closed the cylinder on a revolver, screamed, and ran toward the front door. Id. One of the officers took cover inside the home while the other retreated outside. Id. Both officers then shot the suspect. Id. at 1155. Unlike the case at bar, there was no video evidence of the altercation at issue in Dicker *426 son to establish what actually occurred. A witness across the street testified that she saw the suspect walk slowly toward the front door with his hands by his sides and that she then heard a gunshot. Id. at 1154-55. She was unable to remember anything beyond that point because she was hit by a stray bullet. Id. at 1155. The police provided conflicting testimony, stating that Dickerson exited the home with his handgun pointed at the officer who fled the home and that the officer fired in order to neutralize the threat to his safety. Id. This court ultimately held that it lacked jurisdiction over the appeal due to the conflicting testimony about the facts of the shooting, but we also suggested in dicta that the shooting would have violated Dickerson’s clearly established rights if it was true that he walked slowly toward the door with his hands at his sides when he was shot. Id. at 1164-65. That dicta does not support the Plaintiffs claim because it assumed a set of facts in which the victim could not have been reasonably perceived as an immediate threat to the officers’ safety. Here, the video evidence provides clear proof that Schlabach reasonably feared for his safety when he fired both shots. Accordingly, Dickerson’s discussion of a situation in which the suspect does not pose a threat to the shooting officer’s safety is not relevant to our analysis in this case.
As the dissent correctly notes, it is settled law that an unarmed defendant has a right not to be shot dead when he does not pose a risk of danger to police or the public. However, even viewing the facts in the light most favorable to the Plaintiff, we hold that the record evidence, including the video, shows that Schlabach had probable cause to believe that Mitchell posed an immediate threat to his safety. The Plaintiff is unable to point to a case holding that it is unconstitutional for an officer to shoot a criminal suspect under similar circumstances. Since Schlabach did not violate any of Mitchell’s “clearly established” rights, the second prong of the qualified immunity analysis also supports our decision to affirm the district court’s award of summary judgment.
⅜ ⅜ ⅜
Accordingly, we AFFIRM the judgment of the district court.

. This factor, standing alone, would not have justified the use of deadly force here. See Bouggess v. Mattingly, 482 F.3d 886, 891 (6th Cir. 2007).

. Contrary to the Plaintiffs assertions that Mitchell might have been as far as 30 feet away from Schlabach at the time of the shooting, the expert testimony actually indicated that the distance between the two was, at most, 21 feet.

. Having already'held that Schlabach did not violate Mitchell’s rights under the Fourth Amendment, it would be anomalous for us to conclude that Schlabach’s actions amounted to a violation of Mitchell’s clearly established rights. Accordingly, the reasoning of this section assumes for the purposes of argument that Schlabach’s actions were unconstitutional, For the reasons set forth below, we hold that even if Schlabach violated Mitchell’s rights, those rights were not "clearly established” at the time of the shooting.