NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0021n.06

Case No. 17-6132

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jan 14, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KSA ENTERPRISES, INC., et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| BRANCH BANKING AND TRUST | ) | KENTUCKY |
| COMPANY, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee. | ) | |

BEFORE: KEITH, CLAY, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Between 2003 and 2010, Kentucky-based KSA Enterprises borrowed more than $8 million from BB&T, a North Carolina bank. During those seven years, the parties' relationship appeared strong: BB&T never placed KSA's loans in default, and, indeed, BB&T continued to lend millions of dollars to KSA. But KSA alleges that things changed in August 2010, when it requested to refinance its loans to secure a lower interest rate. While BB&T assured KSA that it was considering the request, KSA contends that BB&T strung it along for more than a year—and continued to collect KSA's interest payments—even though BB&T never intended to refinance the loans.

The relationship took a turn for the worse in September 2011, when BB&T told KSA that its loans were "problem loans" and that KSA needed to either change its business practices, add additional guarantors, or refinance the loans with a different lender. KSA took the latter course.

And because KSA paid off the loans before their maturity date, it owed BB&T prepayment penalties under the loan agreements.

This suit followed, with KSA bringing a host of claims against BB&T: (1) breach of contract; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) fraudulent inducement; and (5) unjust enrichment. The district court granted BB&T's motion to dismiss the breach of contract, negligent misrepresentation, and fraudulent inducement claims, but KSA's fraudulent misrepresentation and unjust enrichment claims survived. The district court later granted BB&T's summary judgment motion on the surviving claims. KSA appeals the district court's decisions, both of which we AFFIRM.

## I.

KSA executed eleven promissory notes with BB&T between January 31, 2003, and November 18, 2010, totaling more than $8.1 million. The third and fourth notes, which KSA and BB&T executed in October 2005, contained a new, affirmative covenant tilted "Debt Service Coverage." That covenant required KSA to maintain a cash flow of 1.15 times the current maturities of its long-term debt.

Much of this suit relates to how BB&T calculated KSA's cash flow. The initial loan agreements do not define cash flow. According to KSA, BB&T orally represented that it would calculate cash flow as "net profit before taxes plus depreciation and amortization and interest and would not subtract owner withdrawals, dividends, or advance [*sic*] to stockholders." (R. 1, Compl. ¶ 20.) But as KSA acknowledges, the loan agreements incorporate by reference a separate document, Exhibit A, which defines cash flow as "net profit before taxes plus depreciation and amortization and interest <u>minus</u> owner withdrawals, dividends, or advances to stockholders." (R. 1, Compl. ¶ 22.) And subsequent loan agreements—those ratified after October 2005—were either

silent as to the definition of cash flow or defined the term as net profit before taxes plus depreciation, amortization, and interest minus owner withdrawals, dividends, and advances to stockholders.

KSA alleges that it had no opportunity to review Exhibit A before executing the loan agreements and contends, "upon information and belief," that BB&T did not attach Exhibit A to the loan agreements. (R. 1, Compl. ¶ 21.) And while KSA continued to execute loan agreements with BB&T after 2005, it still believed that the term, cash flow, included owner withdrawals, dividends, and advances to stockholders. This misunderstanding did not seem to matter—at least for several years.

In August 2010, KSA made two requests of BB&T: it wanted to borrow more and to refinance its existing loans. As KSA alleges, BB&T made statements suggesting that it intended to refinance the loans, even though BB&T knew that those statements were false. Then, in September 2011, BB&T informed KSA that it had violated the Debt Service Coverage provision and that its loans were "problem loans." BB&T told KSA that it must either change its business practices, provide additional guarantors, or refinance its loans with a different lender. Although BB&T allegedly never placed the loans in default, KSA took the warning seriously and refinanced many of the loans with a different lender.

KSA advances two theories of damages, the first of which relates to the definition of cash flow. When BB&T calculated KSA's cash flow according to the definition in Exhibit A, KSA's loans appeared troubled, prompting BB&T to tell KSA to take corrective action. In turn, KSA refinanced with a different lender and paid BB&T the prepayment penalties under the loan agreements. KSA seeks to recover those penalties. Second, KSA alleges that over the course of thirteen months, BB&T falsely represented that it intended to refinance the outstanding loans—

and all along collected KSA's interest payments. KSA argues that it could have refinanced the loans with a different lender—on an earlier date and at a lower interest rate—and thus reduced its interest payments sooner. Relatedly, KSA alleges that BB&T sought reimbursement for the legal and appraisal expenses it incurred when evaluating KSA's refinancing request, even though BB&T had no intention of refinancing the loans.

**II**.

We turn first to the district court's dismissal of KSA's breach of contract, fraudulent inducement, and negligent misrepresentation claims. We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008). And in this diversity action, we apply Kentucky's substantive law. *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 313 (6th Cir. 1999).

**A.**

KSA alleges that BB&T breached the loan agreements by changing the cash flow definition and ultimately warning KSA that the loans were in or nearing default. Under Kentucky law, a party alleging a breach of contract "must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).

The central dispute here is whether BB&T breached any provision of the loan agreements. "It is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Northampton Restaurant Group, Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (citations and internal alterations omitted). This proves fatal to KSA's claim. By KSA's own admission, BB&T never gave KSA any "notice that any of the loans were in default or that the debt would be

accelerated under the terms of the notes or loan agreements." (R. 1, Compl. ¶ 28.) Indeed, KSA does not allege that BB&T changed their course of business, even after BB&T determined that KSA had violated the Debt Service Provision and after BB&T warned KSA that its loans were "problem loans." At most, KSA alleges that BB&T made "threatening" communications, which prompted KSA to refinance the loans with another lender and pay BB&T prepayment penalties. But the mere threat that the loans were in or nearing default is not a breach.

We also note that Kentucky's statute of frauds, which explicitly bars reliance on oral representations in the context of loan agreements, presents an insurmountable hurdle to KSA's breach of contract claim. The statute states, "no action shall be brought to charge any person . . . upon any promise, contract, agreement, undertaking, or commitment to loan money" unless the contract "be in writing and signed by the party to be charged therewith . . . ." Ky. Rev. Stat. § 371.010(9). In response, KSA argues that the parol evidence rule allows it to introduce BB&T's alleged oral representation about the definition of cash flow. It is true that courts may consider parol evidence to resolve ambiguity in a contract. *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322 (Ky. Ct. App. 2009). But if the contract is not ambiguous, "the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). Here, KSA seeks to admit parol evidence—*i.e.,* BB&T's oral representations—that contradicts the plain language of the loan agreements. Accordingly, we cannot consider this evidence under the parol evidence rule, nor can we enforce the unwritten evidence against BB&T.

KSA also alleges that BB&T breached the contract by violating the implied covenant of good faith and fair dealing. In Kentucky, "[e]very contract carries 'a duty to do everything necessary to carry them out.'" *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F.

Supp. 2d 629, 636 (E.D. Ky. 2012) (quoting *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)). Although a breach of this covenant does not create a standalone cause of action, *J.S. v. Berla*, 456 S.W.3d 19, 25 (Ky. Ct. App. 2015), it may serve as the basis for a breach of contract claim. *State Auto Prop. and Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 196 (6th Cir. 2015).

A party alleging a breach of the covenant of good faith and fair dealing "must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457–58 (6th Cir. 2005) (quoting 23 *Williston on Contracts* § 63.22 (4th ed. 2004)). And specifically for banks, the covenant imposes "the duty to act in a bona fide manner," which Kentucky courts have interpreted to mean "with good faith; honestly, openly, and sincerely; without deceit or fraud . . . ." *Pearman v. West Point Nat'l Bank*, 887 S.W.2d 366, 368, 368 n.3 (Ky. Ct. App. 1994).

KSA argues that BB&T breached the covenant in two ways. First, KSA alleges that BB&T breached the covenant when it applied Exhibit A's definition of cash flow to assess KSA's performance and then warned KSA that its loans were "problem loans." Second, KSA argues that BB&T breached the covenant when it charged KSA legal and appraisal fees related to KSA's refinancing request, even though BB&T had no intention of granting that request.

Neither of these two allegations, taken as true, show that BB&T acted in bad faith to deny KSA the benefit of the bargain. *See O'Kentucky Rose*, 147 F. App'x at 457–58. Kentucky's statute of frauds prevents us from construing BB&T's alleged oral representation of cash flow as part of the loan agreement. That BB&T defined cash flow as represented in Exhibit A does not imply that BB&T denied KSA the benefit of the bargain. Separately, refinancing was never part of the bargain. The loan agreements did not contemplate refinancing—much less *entitle* KSA to

refinancing—were interest rates to drop. Accordingly, KSA's claim that BB&T breached the implied covenant of good faith and fair dealing fails.

For these reasons, we affirm the district court's decision to dismiss KSA's breach of contract claim.

**B.**

We now turn to KSA's claim that BB&T fraudulently induced it to execute the loan agreements, based on BB&T's oral representation of cash flow. A plaintiff alleging fraudulent inducement must show: "(1) a material misrepresentation; (2) which is false; (3) which was known to be false, or made recklessly; (4) which was made with an inducement to be acted upon; (5) which is acted upon in reliance thereon; and (6) which causes injury." *Fifth Third Bank v. Canfield*, 2013 WL 5966886, at *5 (W.D. Ky. Nov. 8, 2013) (citing *United Parcel Service Co. v. Rickert*, 966 S.W.2d 464, 468 (Ky. 1999)). The district court dismissed this claim after concluding that KSA did not identify any damages resulting from BB&T's representation, and we affirm that decision on appeal.

KSA alleges damages based in part on the legal and appraisal fees it paid to BB&T. But those fees stem from KSA's requests in 2010 and 2011 to refinance its loans with BB&T. KSA sought to refinance its loans before it ever learned about the discrepancy in the definition of cash flow and before BB&T determined that KSA's loans were "problem loans." Thus, KSA has not shown how BB&T's oral representation relates to—much less *caused*—its payment of legal and appraisal fees.

Separately, KSA alleges that BB&T's adoption of Exhibit A's definition of cash flow triggered a series of events that led to its payment of the prepayment penalties. According to KSA, BB&T applied Exhibit A's definition of cash flow and determined that the loans were in trouble.

BB&T subsequently offered KSA three solutions: KSA could change its business practices, find additional guarantors, or refinance with a different bank to avoid defaulting on the loans. KSA voluntarily chose the latter option and in doing so, prematurely paid off its loans with BB&T and incurred the prepayment penalties, as specified in the loan agreements. Still, KSA has not shown how its reliance in 2005 on BB&T's alleged oral representation of cash flow caused it to make the prepayment penalties to BB&T years later. A party alleging fraudulent inducement must show that the misrepresentation was the legal or proximate cause of the injury. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 553 (Ky. 2009). That is, the misrepresentation "must also be a substantial factor in bringing about the plaintiffs [*sic*] harm." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)). To be sure, BB&T's oral representation may have induced KSA to enter into the loan agreements. But that is a different matter from KSA's decision, six years later, to voluntarily refinance its loans with a different lender and thus make prepayment penalties to BB&T. This alleged injury is too attenuated from the alleged misrepresentation to sustain a claim for fraudulent inducement.

Accordingly, we affirm the district court's dismissal of KSA's fraudulent inducement claim.

## C.

KSA's next claim is for negligent misrepresentation. KSA asserts that BB&T made three misrepresentations. First, KSA alleges that BB&T's oral representation about the definition of cash flow was a negligent misrepresentation, which prompted KSA to enter into the loan agreements with BB&T. Second, KSA contends that BB&T repeatedly and recklessly stated that it intended to refinance KSA's loans. KSA asserts that it relied on those assurances and paid additional interest to BB&T that it otherwise would not have paid. Third, KSA alleges that BB&T

made numerous statements that KSA's loans were in default or would be placed in default when, in fact, BB&T never placed those loans in default. KSA argues that the latter representation prompted it to refinance its loans with a different lender and thus incur prepayment penalties that it otherwise would not have paid.

> In Kentucky, a claim for negligent misrepresentation arises when a party:
>
> (1) in the course of [] business or a transaction in which [it] has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, if (3) [it] fails to exercise reasonable care or competence in obtaining or communicating the information and (4) the plaintiff justifiably relied on the information.

*Republic Bank & Tr. Co. v. Bear Stearns & Co., Inc.*, 707 F. Supp. 2d 702, 713 (W.D. Ky. 2010), *aff'd*, 683 F.3d 239 (6th Cir. 2012) (citations omitted).

As the district court correctly explained, "'a party's intent to perform a promise or agreement *cannot* form the basis of a negligent misrepresentation claim.'" (R. 13, Order Grant'g Mot. to Dismiss at PageID #248–49 (quoting *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 619 (Ky. Ct. App. 2011) (emphasis in original).) Thus, BB&T's promises to refinance KSA's loans cannot serve as the basis for KSA's negligent misrepresentation claim. That leaves KSA's oral representation about the definition of cash flow and BB&T's warning that the loans were in or nearing default.

We first consider the allegation that BB&T misrepresented the definition of cash flow. At the outset, we note that a plaintiff alleging negligent misrepresentation bears some burden to protect himself. Indeed, if the plaintiff:

> [C]ould have uncovered [the misrepresentation] 'by ordinary vigilance and attention,' his failure to do so deprives him of a remedy. Similarly, if a plaintiff had a chance to read a material document but declined to do so because of the defendant's statements, he is charged with knowledge of its contents.

*Republic Bank & Tr.*, 707 F. Supp. 2d at 710 (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. Ct. App. 1931)).  And in Kentucky, "one who signs a contract is presumed to know its contents . . . ."  *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012, 1015 (6th Cir. 1952).

There is no dispute that the October 2005 loan agreements, which contained a new covenant related to KSA's cash flow, do not define cash flow.  Instead, KSA alleges that the loan agreements incorporated a definition from Exhibit A, which differs from the definition that BB&T orally represented to KSA.  KSA does not allege categorically that Exhibit A did not accompany the loan agreements at the time of execution, nor does it suggest that BB&T later amended Exhibit A without its knowledge.  Rather, KSA alleges that "[u]pon information and belief, Exhibit A was not attached to the loan agreements and KSA was not given an opportunity to review Exhibit A defining Cash Flow and Debt Service Coverage."  (R. 1, Compl. ¶ 21.)  Nothing prevented KSA from asking to read Exhibit A—or waiting to execute the loan agreements until it had a chance to do so.  KSA's failure to exercise ordinary vigilance deprives it of a remedy.

Even supposing KSA had exercised the requisite level of vigilance, KSA's negligent misrepresentation claim fails for the same reason as its fraudulent inducement claim:  KSA has not shown that the alleged misrepresentation caused an injury.  *Flegles*, 289 S.W.3d at 553.  The link between BB&T's oral representation about the definition of cash flow and KSA's ultimate injury—in the form of prepayment penalties—is too attenuated to survive BB&T's motion to dismiss.

Finally, we consider BB&T's warning that the loans were in or nearing default.  On appeal, BB&T claims that KSA forfeited this part of its negligent misrepresentation claim because KSA did not defend this specific allegation in its response to BB&T's motion to dismiss.  A party's

failure to respond to an argument raised in a motion to dismiss results in the forfeiture of that argument. *See, e.g.*, *Notredan, L.L.C. v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013). But even if KSA did not forfeit this aspect of its negligent misrepresentation claim, KSA's allegations cannot survive a motion to dismiss. A party alleging negligent misrepresentation must show that the defendant supplied false information. *Presnell Const.*, 134 S.W.3d at 580. KSA makes no such showing here, even though a plaintiff alleging negligent misrepresentation must plead that claim with particularity. *See, e.g.*, *Republic Bank & Tr.*, 683 F.3d at 247–48 (citing *Thomas v. Schneider*, 2010 WL 3447662, at \*1 n.2 (Ky. Ct. App. Sept. 3, 2010)). KSA alleges that BB&T employees "stated at various times that Plaintiffs' loans were in default because Plaintiffs had violated the coverage ratio provisions of the loan agreements." (Compl. ¶ 29.) But KSA does not allege that those statements were false. Instead, it asserts that no one from BB&T "gave Plaintiffs notice that any of the loans were in default," (R. 1, Compl. ¶ 28) and that BB&T "did not provide Plaintiffs with a coverage ratio calculation showing that Plaintiffs were in violation of the coverage ratio provisions of the loan agreements or otherwise in default of the terms and conditions of these loans." (R. 1, Compl. ¶ 30.) Just because BB&T did not give KSA formal notice that the loans were in default or provide KSA with a coverage ratio calculation does not mean that the loans were not in default.

For these reasons, we affirm the district court's decision to dismiss KSA's negligent misrepresentation claim.

### III.

The district court denied BB&T's motion to dismiss KSA's fraudulent misrepresentation and unjust enrichment claims, allowing those claims to proceed to discovery. But while KSA's complaint alleges several different examples of fraudulent misrepresentation, the district court

found that only these allegations plausibly state a claim:  (1) in August 2010, KSA asked about refinancing its loans with BB&T; (2) BB&T representatives responded favorably and assured KSA of BB&T's intention to refinance the loans, even though they had no such intention; (3) based on these assurances, KSA did not refinance its loans with other lenders; and (4) in September 2011, BB&T told KSA that it would not refinance the loans and suggested that KSA refinance elsewhere. Similarly, the district court narrowed KSA's unjust enrichment claim to the allegation that BB&T made false statements about refinancing the loans, causing KSA to pay BB&T above-market interest that KSA would not have paid had KSA refinanced with a different lender.  After some discovery, the district court granted BB&T's summary judgment motion on both claims.

We review de novo the district court's grant of summary judgment.  *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018).  At summary judgment, the court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party.  Fed. R. Civ. P. 56(a).  The moving party—here, BB&T—has the initial burden of proving that "no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989)).  If the moving party meets that burden, the nonmoving party—here, KSA—must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Id.*  We review the record, drawing all inferences in the light most favorable to KSA. *Mitchell v. Schlabach*, 864 F.3d 416, 420 (6th Cir. 2017).

In August 2010, KSA's principal, Dr. Laxmaiah Manchikanti, met with Randy Hendon, a loan officer at BB&T's Paducah, Kentucky, branch, to discuss the possibility of refinancing KSA's loans.  According to Manchikanti, Hendon stated that "[w]e will look into that" request.  (R. 68-3,

Manchikanti Dep. at PageID #841.)  After the initial meeting, Hendon and a BB&T senior credit officer discussed KSA's request, and sometime later in 2010, Hendon delivered BB&T's proposal to KSA.  BB&T offered to reduce KSA's interest rate if KSA paid a one-time fee equal to about half of KSA's total interest payments for the forthcoming year.  KSA rejected the proposal.

Sometime in January 2011, KSA again asked about refinancing its loans with BB&T.  KSA does not specify when it made this request or who made the request on behalf of KSA.  Indeed, the only record evidence about KSA's inquiry is an email dated February 1, 2011, in which KSA's outside accountant, Steve Hawkins, asked Hendon, "do you have any information for me regarding the ksa re-fi possibilities we discussed a couple of weeks ago?"  (R. 68-18, Email at PageID #1440.)  Hendon responded, "I do think we will be able to do something."  (*Id.*)  In that same email, Hendon informed Hawkins that he had "worked on getting a full package ready some yesterday for the Regional Loan Administrator to take a look at."  (*Id.*)  Hendon and Hawkins continued to email back and forth that spring, with Hendon stating, "I promise when I hear something about what is [*sic*] will take to get some of these loan rates for Dr Manchikanti lowered." (*Id.* at PageID #1441.)  And Hendon promised to "move [the request] on up the line" and offered to send a separate email to Manchikanti to apologize for the delay.  (*Id.* at PageID #1442.)

While BB&T was considering KSA's refinancing request, KSA's credit risk increased.  In November 2010, BB&T assigned KSA a risk score of 4B, meaning that KSA had a normal credit risk.  But in March 2011, BB&T completed a "Loan Review Summary Risk Analysis," and subsequently increased KSA's risk score to 7, which suggests "potential weaknesses" in a borrower's finances.  When a borrower's risk score is 7 or higher, BB&T classifies the customer's loans as "problem loans" and places them on a watch list.  But BB&T senior vice president Mark Thomas explained that BB&T may refinance or consolidate the loans of an entity with a risk score

of 7. Thomas also reiterated that BB&T has no policy against refinancing loans on its watch list and that the bank may choose to refinance "problem loans," provided that "no new monies are advanced and the loans continue to amortize and pay down and reduce exposure on a go-forward basis . . . ." (R. 64, Thomas Dep. at PageID #653.)

After BB&T increased KSA's risk score, it began to scrutinize KSA's finances more closely. On March 30, 2011, BB&T credit officer Warren Takacs emailed Hendon, explaining that "we have to call it like we see it and help Dr. M to help himself out of harm's way." (R. 87, Email at PageID #1951.) Hendon later testified that he interpreted Takacs's email to mean that "I probably need to start talking to Dr. Manchikanti about the movement of his loans." (R. 68-16, Hendon Dep. at PageID #1367.) In March, Hendon arranged to meet with Hawkins to review KSA's financials and requested financial information from KSA, Manchikanti, and Manchikanti's other businesses. Hawkins believed that these requests related to KSA's earlier request to refinance its loans, and he provided some of that information upfront. But in a letter dated April 25, 2011, Hawkins told Hendon that Manchikanti's individual tax returns would not be ready until the end of June and that Manchikanti's personal financial statement would not be complete until the end of July.

Through June 2011, Hawkins, Manchikanti, and Hendon exchanged emails about the status of KSA's refinancing request. Although BB&T had increased KSA's credit risk, Hendon never suggested that KSA was ineligible for refinancing. In a June 30, 2011, email, for example, Hendon told Manchikanti that "the total review that has been taking place in my opinion for too long." (R. 68-18, Email at PageID #1451.) Meanwhile, Hendon continued to ask his BB&T colleagues about the status of KSA's refinancing request, explaining in a July 2011 email, "I don't want to sound like I am being pushy on this I really just wanted to know where we are with the KSA files." (*Id.*

at PageID #1453.)   In response, a colleague reminded Hendon that Manchikanti had not yet provided his tax returns, which Hendon had requested in his meeting earlier that year with Hawkins.   Thus, BB&T continued to seek additional financial information from KSA into August 2011.

KSA's relationship with BB&T reached its nadir in September 2011, when BB&T loan administrator Amaju Stoner paid a visit to Manchikanti and informed him that KSA's loans "were problem."   (R. 68-3, Manchikanti Dep. at PageID #838.)   About one week after that meeting, Manchikanti decided to pursue refinancing elsewhere and ultimately refinanced KSA's loans with a different bank a little less than a year later.

**A.**

First, we consider KSA's fraudulent misrepresentation claim.   The plaintiff must prove six elements to prevail on a fraudulent misrepresentation claim: "(a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury."   *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978).   And the plaintiff must prove its claim with clear and convincing evidence.   *Id.*   As the district court correctly notes, a party generally cannot bring a fraud claim based on promissory statements that relate to future actions or conduct, such as a promise to refinance a borrower's loans.   *See Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964).   But there is an important exception to that rule.   Under the "deception" exception, a claim for fraud may proceed "when a deliberately false opinion is expressed or when a promise is made with the present intent of a future breach, or with no intention of carrying out the promise or declaration of future expectations . . . ."   *Edward Brockhaus & Co. v. Gilson*, 92 S.W.2d 830, 835 (Ky. 1936).   KSA's claim as alleged falls within that exception.

To begin, KSA must show that BB&T made a material misrepresentation. *Wahba*, 573 S.W.2d at 359. Here, KSA must show that (1) BB&T represented to KSA that it intended to refinance KSA's loans; and (2) BB&T never intended to refinance KSA's loans when it made that representation. KSA has advanced no evidence to suggest that BB&T made such a representation, much less that the representation was false. Although KSA identifies several statements that BB&T made about the refinancing request, none amount to a promise to refinance the loans. In August 2010, for example, Hendon told Manchikanti that BB&T "will look into that," referring to the refinancing request. And it did, returning to KSA later that year with a proposal that Manchikanti and KSA rejected. The closest BB&T came to making a promise was Hendon's February 2011 email, in which he stated, "I do think we will be able to do something." But this was still a speculative statement, not an unconditional promise. Indeed, in that same email, Hendon implicitly acknowledged that he could not guarantee BB&T would lower KSA's interest payments, explaining that he was preparing a proposal on KSA's refinancing request to higher-ups at BB&T.

Because KSA has offered no evidence—let alone clear and convincing evidence—that BB&T ever promised to refinance the loans, KSA cannot show that BB&T made a material misrepresentation. Its fraudulent misrepresentation claim necessarily fails, and we need not address KSA's additional arguments regarding this claim.

**B.**

KSA's final claim is for unjust enrichment. KSA alleges that BB&T's false representations about its intention to refinance the loans caused KSA to pay above-market interest rates, which KSA would not have paid had it refinanced sooner with a different lender.

A plaintiff alleging unjust enrichment must show three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). But this doctrine "has no application in a situation where there is an explicit contract which has been performed." *Codell Const. Co. v. Com.,* 566 S.W.2d 161, 165 (Ky. Ct. App. 1977) (citation omitted).

KSA and BB&T's loan agreements represent an express contract, which required KSA to make interest payments to BB&T. This alone defeats KSA's unjust enrichment claim. Moreover, KSA has not supplied any evidence to suggest that BB&T's retention of the interest payments was inequitable. Thus, KSA did not unjustly enrich BB&T by continuing to make its interest payments on the loans, as it was contractually obligated to do. KSA's unjust enrichment claim also fails.

**IV.**

For the reasons discussed above, we AFFIRM the district court's decisions granting BB&T's motion to dismiss and summary judgment motion.