RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

CORY DRISCOLL,

        *Plaintiff-Appellee*,

  *v.*

MONTGOMERY COUNTY BOARD OF COUNTY COMMISSIONERS, et al.,

        *Defendants*,

JENNIFER L. SMILEY, Deputy, in her official and personal capacity,

        *Defendant-Appellant*.

No. 24-4060

─────────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:22-cv-00287—Thomas M. Rose, District Judge.

Argued: October 23, 2025

Decided and Filed: April 23, 2026

Before: WHITE, STRANCH, and MURPHY, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:** Andrew T. French, MONTGOMERY COUNTY PROSECUTOR'S OFFICE, Dayton, Ohio, for Appellant. J. Robert Linneman, SANTEN & HUGHES, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Joshua T. Shaw, MONTGOMERY COUNTY PROSECUTOR'S OFFICE, Dayton, Ohio, for Appellant. J. Robert Linneman, H. Louis Sirkin, SANTEN & HUGHES, Cincinnati, Ohio, Becca Steinberg, Brian Wolfman, Regina Wang, GEORGETOWN LAW APPELLATE COURTS IMMERSION CLINIC, Washington, D.C., for Appellee.

    WHITE, J., delivered the opinion of the court in which STRANCH, J., concurred. MURPHY, J. (pp. 20–30), delivered a separate dissenting opinion.

––––––––––––––––––

**OPINION**

––––––––––––––––––

HELENE N. WHITE, Circuit Judge.   Plaintiff Cory Driscoll brought constitutional and state tort claims against Defendant Deputy Sheriff Jennifer Smiley after she shot him.   Deputy Smiley appeals the denial of her motion for summary judgment based on qualified immunity and state statutory immunity.   We AFFIRM.

## I.  Factual Background

On May 10, 2020, at Possum Creek MetroPark in Montgomery County, Ohio, Cory Driscoll began making noises that sounded like "rolling his R's."  R. 38, Page ID 498.  He says he was engaged in "prayer and meditation," while "speak[ing] in tongues."  R. 29-1, Page ID 304-05; R. 38, Page ID 498.  Driscoll has been diagnosed with schizoaffective and bipolar disorders which cause manic episodes where he finds it "difficult . . . to control [his] movement, [his] verbal communication, and [his] thinking."  R. 29-1, Page ID 304.

Park visitors came upon Driscoll and found his conduct concerning.  They approached his car to offer help but he ignored them.   One of the visitors, Marisah Roberts, contacted the Montgomery Regional Dispatch Center non-emergency line and requested help.   When asked, she told dispatch that she did not see any weapons, but that she may have seen a lighter in Driscoll's car.  Driscoll ignored the park visitors and, while Roberts spoke with dispatch, left his car for a nearby lake where he filled a one-gallon jug with lake-water.  He returned to his car, drinking from his jug and continuing to speak in tongues.

Deputy Jennifer Smiley was on patrol a short distance away and went to the scene. Dispatch informed Deputy Smiley that a man wearing a long-sleeve shirt and black pants was running down the trail with a big water jug in his hands and making a strange noise like "rolling his R's," that he had previously been inside the car with his head on the steering wheel, and that there may have been a lighter inside his car.  R. 22-8, Page ID 245.  Dispatch also relayed Roberts's suspicion that "he might be on something." *Id.*  Dispatch did not suggest that Driscoll

was armed, dangerous, or that he was carrying gasoline.  To the contrary, the dispatch logs indicate that he held "a big water jug in his hands." *Id.*

Shortly after Deputy Smiley arrived on the scene, Driscoll emerged from the hiking trail and returned to the parking lot.  One of the park visitors captured the interaction between Deputy Smiley and Driscoll on video.  As Driscoll approached the parking lot, he held a gallon jug of water in his hand and continued speaking in tongues.  Deputy Smiley immediately ordered Driscoll to drop his jug.  Driscoll did not drop the jug, but walked toward Deputy Smiley, stopping several paces away from her, holding the jug at his side.  Seconds later, Deputy Smiley repeated her command, with her hand on her gun.  Her voice rose to a shout, and Driscoll raised his voice as well.  Driscoll then took a drink from his jug and threw it on the ground, thus complying with Deputy Smiley's command eighteen seconds after she issued it.

As Driscoll discarded the jug, he stepped towards Deputy Smiley.  In response, Deputy Smiley pointed her gun at Driscoll and radioed to dispatch "he's pouring gasoline."  R. 23, Radio at 4:06-10, Video at 0:33-35.  Based on the video evidence, this was the first time anyone mentioned gasoline.  Roberts had not indicated that Driscoll had gasoline, dispatch did not tell Deputy Smiley that Driscoll had gasoline, and none of the observers said Driscoll had gasoline.  No one, including Deputy Smiley, reported smelling gasoline.  Nor did Driscoll perceptibly react to drinking the liquid.  Deputy Smiley claims that gasoline was mentioned earlier; in a statement given three days after the incident, she wrote that "[a]t some point someone" told her that he might have gasoline.  R. 22-7, Page ID 240.  But that interaction, if it occurred, was not captured on an audio or video recording or in any other witness statement.

As Driscoll approached, Deputy Smiley ordered him to stop walking, and he complied.  She then ordered him to the ground.  He instead backed up, holding his hands up, open and empty.  She continued to shout at him and he continued to speak in tongues.  In an affidavit, Driscoll stated that Deputy Smiley's "aggressive actions" induced panic, anxiety, fear, and ultimately a "manic episode," leaving him "no longer [in] control."  R. 29-1, Page ID 305-06.

Driscoll then turned away from Deputy Smiley, picked up his jug, and took two more swigs of water, pouring it out between swigs.  By radio, Deputy Smiley requested a medic,

saying that Driscoll was "drinking gasoline." *Id*., Video at 1:28-33, Radio at 5:04-5:06. As the district court noted, one witness believed that Driscoll was pouring the contents of the jug out to show that it was only water. Driscoll then approached Deputy Smiley again. Deputy Smiley threatened to shoot him and he stopped. After more shouting, Driscoll again threw down his water jug, stepped forward, and appeared to tell Deputy Smiley, "shoot me." R. 23, Video at 2:20-22. He then said, "I'm drinking gasoline." R. 23, Video at 2:22-27. As the district court observed, his inflection was "arguably inquisitory," indicating that he was responding to her statement that he was drinking gasoline by repeating the phrase as a question, rather than stating that he was, in fact, drinking gasoline. R. 38, Page ID 501.

For the next minute, the pattern continued. Deputy Smiley yelled, "I don't want to fucking shoot you," while Driscoll appeared to respond, "come on." R. 23, Video at 2:27-49. Driscoll asked why he had to get on the ground; Deputy Smiley responded that it was an order. She then ordered him to put his hands on the sidewalk, to which he responded, "no." R. 23, Video at 2:58-3:13. Driscoll then began repeating, "the blood of Jesus." R. 23, Video at 3:21-34. He took two swigs of water and dropped his jug. Even though Driscoll was standing still, Deputy Smiley told him, "You take a step towards me, I'm going to fucking shoot you." *Id.* at 3:32-34. He responded, "shoot me." *Id.* With his hands empty, Driscoll approached Deputy Smiley and, when he was still at least a few paces away, she shot him in the abdomen.

Driscoll survived the shooting but lost a kidney and suffered significant internal injuries. His injuries required multiple surgeries, and he remained in the hospital for a month. He is now permanently disabled and unable to work, and he suffers from Post-Traumatic Stress Disorder.

The Sheriff's Office interviewed the civilian witnesses in the immediate aftermath of the shooting. Investigation of Driscoll's jug revealed that it did not contain gasoline. Deputy Smiley was interviewed two days after the incident, on May 12, 2020, and authored a written statement on May 13, 2020. A grand jury heard evidence related to the use of deadly force but returned no indictment.

Driscoll brought this action against Smiley, the Montgomery County Board of County Commissioners, the Montgomery County Sheriff's Office, and Montgomery County Sheriff Rob

Streck.  Driscoll raised eight claims, including constitutional claims brought under 42 U.S.C. § 1983 against various individuals and the municipality and related state-law claims of false arrest, battery, and intentional infliction of emotional distress.  At summary judgment, the district court dismissed all of Driscoll's claims except his Fourth Amendment excessive-force claims and his state-law claims against Deputy Smiley in her personal capacity for battery, intentional infliction of emotional distress, and false arrest.  The district court declined to apply the doctrine of qualified immunity and Ohio's statutory immunity provisions to shield Smiley from these federal and state claims.  Smiley then filed this interlocutory appeal seeking to reverse the denials of qualified and statutory immunity.

## II.  Legal Background

"We review a summary judgment decision de novo, using the same standards considered by the district court." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007) (citing *Thomas v. Cohen*, 453 F.3d 657, 660 (6th Cir. 2006)).  Summary judgment is appropriate where "there is no genuine dispute [of] material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Put differently, "[w]e view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023).

At summary judgment, "a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.* at 447 (internal citations omitted).    When a defendant asserts qualified immunity, "the plaintiff has the burden of showing that the defendant is not entitled to qualified immunity." *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024).  Although the denial of summary judgment is generally a nonfinal order that cannot be appealed immediately, the Supreme Court has held that a denial of qualified immunity is subject to interlocutory appeal. *See Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).  That is because "the qualified immunity doctrine exists partly to protect officials from having to stand trial [and] a defendant wrongly forced to go to trial loses the benefit of the immunity even if . . . exonerated after trial." *Id.* at 516 (further citation omitted).

Our review of a district court order denying qualified immunity is limited to questions of law; "the appeal cannot be from a district court's determination that there is a genuine dispute of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (citing *Mitchell*, 472 U.S. at 530). "The effect of this limitation is that the defendant appealing a denial of qualified immunity must concede the plaintiff's facts." *Wiertella v. Lake Cnty.*, 141 F.4th 775, 781 (6th Cir. 2025) (quoting *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016)). There is an exception to this rule: when the record contains video of the incident, we may not adopt a version of the facts "that is 'blatantly contradicted' by video footage." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). But we "must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff.'" *Raimey*, 77 F.4th at 447 (quoting *LaPlante*, 30 F.4th at 578).

### III.  Analysis

### A.  Excessive Force

The parties agree that Deputy Smiley employed deadly force against Driscoll. The use of deadly force by a police officer violates the Fourth Amendment when it is not "objectively reasonable" under the "totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 76 (2025) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). The Supreme Court has held that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Further, the Court in *Garner* held that deadly force was constitutionally reasonable only when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3.

We have set out a non-exclusive test for evaluating whether an officer's use of force was reasonable: "(1) why the officer was called to the scene; (2) whether the officer knew or reasonably believed that the person was armed; (3) whether the person verbally or physically threatened the officer or disobeyed the officer; (4) how far the officer was from the person; (5) the duration of the entire encounter; (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer; and

(7) whether the officer could have diffused the situation with less forceful tactics." *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022) (cleaned up), *abrogated on other grounds by Barnes*, 605 U.S. at 83, *as recognized by Booth v. Lazzara*, 164 F.4th 581, 593 (2026). Applying these factors, and viewing the evidence in his favor, Driscoll has sufficiently established that Deputy Smiley used excessive force when she shot him.

First, we consider why Smiley was called to the scene. When officers respond to dangerous situations, they have reason to fear for the safety of themselves and others. But when officers are called to a scene without indication that a situation is dangerous, this factor cuts against the reasonableness of the deadly force. *See Palma*, 27 F.4th at 432 (deadly force unreasonable where officer was responding to argument over a TV remote, not a crime); *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 482 (6th Cir. 2022) (deadly force unreasonable where officer was conducting welfare check); *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (deadly force unreasonable where decedent called the police himself and no one accused him of "threatening or violent behavior"). Here, Deputy Smiley was not responding to any report of criminal conduct. To the contrary, Roberts contacted a non-emergency line and sought help for Driscoll. She reported no dangerous activity or weapons. The fact that Deputy Smiley was essentially conducting a welfare check suggests that her use of deadly force was unreasonable. *See Campbell*, 47 F.4th at 482.

Deputy Smiley argues that, based on the information she received from dispatch, she had reason to believe that Driscoll was intoxicated, which she says would have been "criminal activity." Appellant's Br. at 15. But as Driscoll points out, in Ohio, public intoxication does not constitute a crime unless the person also poses a risk of physical harm. Appellee's Br. at 29; *McCurdy v. Montgomery County*, 240 F.3d 512, 517 (6th Cir. 2001), *abrogated on other grounds by Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006). In any event, even if she believed that Driscoll had been using illegal substances, Deputy Smiley had no reason to think he was dangerous, or that the situation posed a particular danger for her or anyone else. *See Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) ("A jury could conclude that disorderly conduct is not a 'serious' crime when determining whether an officer used excessive force in

effecting the arrest for that crime."). We therefore conclude that the facts as known to Deputy Smiley before encountering Driscoll cut against the reasonableness of her use of force.

Second, we consider whether Deputy Smiley knew or reasonably believed that Driscoll was armed. In general, "[t]he stronger the evidence showing that a person is armed, the more likely the use of lethal force is reasonable. When the evidence is weak, this factor cannot justify the use of lethal force." *Palma*, 27 F.4th at 433 (internal citations omitted); *see also Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) (use of force reasonable where a man told officers he had a gun and brandished a "silver object"). However, even if the person is visibly armed, "lethal force may *still* be unreasonable." *Palma*, 27 F.4th at 433. Here, taking the evidence in the light most favorable to Driscoll, Deputy Smiley had no reasonable basis to believe that Driscoll was armed. She was not told that he had a weapon, merely that there may have been a lighter in his car. She did not observe any weapons. She only observed Driscoll carrying a jug of water. Even crediting her subjective belief that the jug contained gasoline, Deputy Smiley has provided no objective basis for drawing that conclusion. And even if there were an objective basis for her belief, Deputy Smiley had no reason to think that Driscoll was about to ignite his jug. Driscoll's hands were visible, open, and clearly empty at the time she shot him. Even if he had a lighter in the car, that would not have placed Deputy Smiley, or anyone else present, in imminent danger. The clear absence of a weapon cuts against the reasonableness of Deputy Smiley's use of lethal force.

Third, we consider whether Driscoll verbally or physically threatened Deputy Smiley or disobeyed her. Driscoll did not verbally or physically threaten anyone. And while he did disobey Deputy Smiley's orders, such "noncompliance alone does not indicate active resistance; there must be something more." *Goodwin*, 781 F.3d at 326 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)). That "something more" can be "a verbal showing of hostility." *Id.* (quoting *Eldridge*, 533 F. App'x at 534-35). Driscoll did not obey Deputy Smiley's repeated commands, and instead continued speaking in tongues. But he did not physically resist or show hostility. His most direct defiance of her orders came when he refused to get on the ground. R. 23, Video at 2:58-3:13. But at this point, Driscoll was not suspected of any wrongdoing. Arrest or detention must be supported by probable cause, or at least reasonable

suspicion; these Fourth Amendment protections would ring hollow if the mere refusal to comply with an unlawful order could constitute active resistance. *See Goodwin*, 781 F.3d at 326. At bottom, Driscoll's refusal to comply with Deputy Smiley's orders does not justify her use of force, much less deadly force. *See Wright v. City of Euclid*, 962 F.3d 852, 868 (6th Cir. 2020) ("the mere failure of a citizen—not arrested for any crime—to follow the officer's commands does not give a law enforcement official authority to put the citizen in handcuffs") (quoting *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017)).

The dissent finds that Deputy Smiley reasonably perceived that Driscoll posed a danger because his erratic behavior could potentially have indicated that he was under the influence of illegal drugs that might lower his inhibitions toward violence. But the dissent, like Deputy Smiley, confuses unusual or surprising behavior with dangerous actions. Driscoll made no threats and did not otherwise indicate an intent to harm anyone. It was unreasonable for Deputy Smiley to conclude from his erratic behavior that he posed an imminent threat of serious physical harm.

Fourth, we consider how far Smiley was from Driscoll. The video does not clarify the distance between Deputy Smiley and Driscoll. Deputy Smiley argues that "two strides" separated her from Driscoll at the moment she shot him. Reply Br. at 11. By contrast, plaintiff's expert determined that "about eighteen feet separated Driscoll and Smiley throughout the encounter." Appellee's Br. at 34. The district court concluded that "the small distance of just a few feet" separated the two. R. 38, Page ID 514. We need not resolve these differences, but we do recognize that "Deputy Smiley was forced to act quickly" given the relatively short distance separating her from Driscoll. *Id.* That Deputy Smiley was forced to act quickly is a factor supporting the reasonableness of her actions.

Relatedly, Deputy Smiley argues that Driscoll's "aggressive approach" just before she shot him justified her use of deadly force. Appellant's Br. at 20 (quoting *Mitchell v. Schlabach*, 864 F.3d 416, 423 (6th Cir. 2017)). But her reliance on *Mitchell* is misplaced. The situation faced by the officer in *Mitchell* materially differed from the one facing Deputy Smiley. In *Mitchell*, the officer faced a man accused of crimes, including drunk driving and assault, who began to charge the officer with fists clenched. *See* 864 F.3d at 421. By contrast, Driscoll was

suspected of no crimes.  He did not charge Deputy Smiley with fists clenched; rather, he walked forward with arms open and empty.  When a person walks toward an officer, even in defiance of orders, the officer may not use deadly force where there is no threatening or aggressive behavior.  *See Palma*, 27 F.4th at 435; *see also Mitchell*, 864 F.3d at 424 ("This decision does not stand for the proposition that deadly force is reasonable or proper whenever a suspect charges an officer or defies an order.").  Driscoll's approach, while perhaps alarming, did not provide Deputy Smiley grounds for the use of deadly force.

Fifth, we consider the duration of the entire encounter.  The reasonableness inquiry must consider that officers may be forced to make split-second judgments in "tense, uncertain, and rapidly evolving" circumstances.  *Graham*, 490 U.S. at 396–97.  Here, the events transpired very quickly.  The video of the incident reveals that Deputy Smiley drew her gun approximately 15 seconds after encountering Driscoll.  She shot him three minutes later.  In all, the encounter took three and a half minutes.  However, the brief nature of the interaction does not cut in favor of Deputy Smiley here, given the lack of justification for her rapid escalation or her subjective fear.  Indeed, the district court determined that, "viewing the facts in the light most favorable to Driscoll, Deputy Smiley appeared to be the aggressor."  R. 38, Page ID 514.  The brief nature of the incident would support Deputy Smiley's use of deadly force only if she were faced with an immediate threat calling for her to make a split-second decision.  But because the district court determined that Driscoll "was not particularly threatening toward Deputy Smiley or anyone else" *id.*, her subjective disagreement with that assessment does not control, *see Graham*, 490 U.S. at 397 ("the 'reasonableness' inquiry in an excessive force case is an objective one").

Sixth, we consider whether Deputy Smiley knew of any ongoing mental or physical health conditions that may have affected Driscoll's responses to her.  Officers must consider a person's "diminished capacity before using force to restrain him."  *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017).  Where relevant, "officers should use their training and expertise in crisis management to determine whether and how to de-escalate a situation before resorting to force."  *Palma*, 27 F.4th at 438.

Deputy Smiley disputes the relevance of this factor, arguing that she had no reason to believe that Driscoll was suffering from a mental disturbance.  She argues, "[f]rom the

perspective of a reasonable officer at the scene, Driscoll's bizarre and ultimately threatening behavior was as consistent with a mental health episode as it was with drug use or a medical issue, such as hypoglycemia." Reply Br. at 7-8. She further argues that "fragmentary evidence" of a mental disturbance was insufficient to put her on notice of an obligation to consider diminished capacity. *Id.* at 6 (quoting *Gaddis ex rel. Gaddis v. Redford Twp.,* 364 F.3d 763, 775 (6th Cir. 2004)). But that framing confuses the issue. Deputy Smiley had no obligation to diagnose Driscoll's behavior as arising particularly from a mental disturbance, a physical condition like hypoglycemia, or drug use; nor did she have an obligation to ignore an imminent danger, if one had appeared. Rather, her obligation was to understand, as any reasonable observer would have, the diminished capacity of the person with whom she was engaging, and to adjust her conduct accordingly. *See Roell*, 870 F.3d at 482.

In this situation, Driscoll's diminished capacity was plainly evident. He was unable to coherently respond to most of what was said to him. He was making strange noises and drinking from a cloudy and dirty jug. Together these facts presented Deputy Smiley with more than "fragmentary" evidence of diminished capacity. Deputy Smiley responded to the situation by drawing her gun and yelling at and threatening Driscoll, despite no evidence he had committed a crime. It did not matter whether Driscoll was mentally ill, physically ill, or on drugs, given his evident lack of capacity and the fact that he posed no threat.

Deputy Smiley cites cases in which this court has held that deadly force is reasonable notwithstanding an individual's diminished condition. For example, in *Naji v. City of Dearborn*, we held that deadly force was justified where an officer did not know of a suspect's mental illness, and where he was brandishing a gun. 120 F.4th 520, 525 (6th Cir. 2024). But notably, in that case, the decedent "did not say a word during the encounter." *Id.* There was thus no way for the officer to know of his diminished capacity. More importantly, the decedent had pointed a gun and was apparently attempting to fire it. *Id.* That made the deadly force reasonable, without regard to his mental disability. *Id. See also Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (deadly force reasonable where armed "mentally ill person pose[d] an imminent threat of serious physical harm"). Here, by contrast, Driscoll's bizarre actions put Deputy Smiley on notice of his diminished capacity, and he clearly possessed no weapon. Regardless of

the reason for Driscoll's diminished capacity, Deputy Smiley should have taken it into account when considering and responding to his disobedience. *See Roell*, 870 F.3d at 482. Core to the excessive force inquiry is whether the officer acted reasonably. Given that Driscoll posed no threat to Deputy Smiley or anyone else, his evident diminished capacity supports the conclusion that Deputy Smiley's actions throughout the encounter were unreasonable.

Seventh, we consider whether Deputy Smiley could have diffused the situation with less forceful tactics. As Driscoll points out, *see* Appellee's Br. at 32, when faced with an unarmed person exhibiting signs of mental instability, an officer has an obligation "to de-escalate the situation and adjust the application of force downward," *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013). Here, taking the facts in the light most favorable to Driscoll, Deputy Smiley was confronted with an unarmed and non-dangerous person who was non-complaint. In such circumstances, she should have attempted to calm Driscoll and thereby de-escalate the situation. *See Martin*, 712 F.3d at 962.

Deputy Smiley argues that, with her gun already drawn, it would have been "both impractical and unwise" for her to have holstered the weapon to attempt non-lethal force." Appellant's Br. at 20 (quoting *Mitchell*, 864 F.3d at 423). Similarly, the dissent questions what else Deputy Smiley should have done rather than shoot Driscoll as he approached her. Both Smiley and the dissent rely on *Mitchell v. Schlabach*, but their reliance on *Mitchell* is misplaced. In *Mitchell*, we held that the officer's choice to draw his gun was reasonable given that he was confronting a suspect who had led a dangerous car chase, and that his choice to fire the gun was reasonable given the context of the preceding car chase and the suspect's aggressive approach. 864 F.3d at 423. *Mitchell* therefore found no fault with the officer's use of deadly force. *Id.* Our focus on the dangerousness of the car chase in *Mitchell* was consistent, furthermore, with the Supreme Court's instruction in *Barnes v. Felix* that we "consider all the relevant circumstances, including facts and events leading up to the climactic moment." 605 U.S. at 76. By contrast, here the district court considered the relevant circumstances, "including [all of the] facts and events leading up to" the moment Deputy Smiley fired her gun and found no evidence that Driscoll acted aggressively or posed a threat to anyone. *Id.* Deputy Smiley had no reason to draw her gun in the first place. And the mere fact that she had drawn it did not justify its use.

On balance, viewing the evidence in the light most favorable to Driscoll, Deputy Smiley's use of force was unreasonable. Deputy Smiley was faced with a noncompliant but non-dangerous person. He had no weapon and gave no indication that he intended to harm others. He was not breaking any laws. Indeed, Deputy Smiley had been called to check on his well-being. That his behavior confused or concerned Deputy Smiley and others in the park did not provide justification for the use of force, much less deadly force. Nor did his noncompliance with Deputy Smiley's orders justify lethal force.

It is true that Deputy Smiley needed to act quickly. In the moments before she shot Driscoll, she faced a difficult situation. Because of that, the dissent questions how Smiley should have known the correct response. But by focusing exclusively on the final moments before Deputy Smiley shot Driscoll, the dissent ignores the Supreme Court's instruction in *Barnes v. Felix* that we "consider all the relevant circumstances, including facts and events leading up to the climactic moment." 605 U.S. at 76. *Barnes* specifically rejected the so-called "moment-of-threat rule," which some courts applied to limit analysis in deadly force cases to the danger facing the officer in the moment before the force was employed. *Id.* at 78–79. *Barnes* instructed courts to consider the entire interaction, explaining that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* at 80. Here, the evidence supports the conclusion that Deputy Smiley unreasonably escalated the situation and unreasonably concluded that Driscoll posed a threat. Under *Barnes*, it is therefore not enough to say that she was justified in shooting Driscoll because, in the moment of his approach, she had to act quickly.

As the district court noted, the strength of Deputy Smiley's justification for her use of force turns in large part "on whether she reasonably believed Driscoll to be in possession of gasoline." R. 38, Page ID 515. Deputy Smiley claims that she had reason to believe that Driscoll had "gasoline and a lighter." Reply Br. at 9. Crediting that claim would require resolution of disputed facts in her favor—most significantly, her contention that someone told her that he had gasoline—which would be improper on summary judgment. Indeed, given the interlocutory nature of this appeal, we lack jurisdiction to consider Deputy Smiley's fact-based arguments. *See Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020) ("We have jurisdiction

only to the extent that the defendant 'limits [her] argument to questions of law premised on facts taken in the light most favorable to the plaintiff.'") (quoting *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008)) (internal brackets omitted).  Nor is this a case where the district court's factual determination is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  *Id.* (quoting *Scott*, 550 U.S. at 380).  Where an officer relies on subjective fear to justify the use of force, we require "objective indicia" that the person is armed.  *Shumate v. City of Adrian*, 44 F.4th 427, 444 (6th Cir. 2022).  The "remote risk" that someone is armed is insufficient.  *Browning v. Edmonson Cnty.*, 18 F.4th 516, 528 (6th Cir. 2021).  Deputy Smiley contends that "someone" told her at some point that Driscoll might have gasoline, R. 22-7, Page ID 240, but that interaction, if it occurred, was not captured on video or radio, nor was it echoed by the witnesses, R. 38, Page ID 515.  And at summary judgment, the district court was required to draw factual inferences in favor of Driscoll, at least where not contradicted by video evidence.

The only other evidence offered in support of Deputy Smiley's contention that she reasonably believed Driscoll to be carrying gasoline is that the liquid was discolored and that Driscoll said, "I'm drinking gasoline."  R. 23, Video at 2:22-27.  The color of the liquid in the video is unclear, and thus the video is not a proper basis for reversing the district court's determination.  *Adams*, 946 F.3d at 948.  As for Driscoll's statement, as the district court recognized, his inflection was "arguably inquisitory."  R. 38, Page ID 501.  That would indicate that Driscoll was questioning Deputy Smiley's accusation that he was drinking gasoline, rather than making a statement that he was drinking gasoline.  In short, Deputy Smiley has presented no evidence undermining the district court's determination that, viewing the evidence in Driscoll's favor, Deputy Smiley's belief that he was drinking gasoline was unreasonable.

On the other hand, there is ample evidence supporting the district court's conclusion that Deputy Smiley's belief that Driscoll carried gasoline was unreasonable.  Driscoll was walking back from a lake carrying a water jug.  He repeatedly drank from the jug with no reaction.  It is unlikely that he would have been able to do so if the jug contained gasoline, a fact that should have been readily apparent to Deputy Smiley.  Finally, no witness, including Deputy Smiley, reported smelling gasoline, despite Driscoll repeatedly pouring the liquid on the ground, and

Deputy Smiley's relative closeness to him. On these facts, even if Deputy Smiley subjectively believed that the jug contained gasoline, that belief was not objectively reasonable.

## B. Clearly Established Law

Deputy Smiley next argues that, even if she violated Driscoll's right to be free from excessive force, that right was not clearly established at the time of the incident. Deputy Smiley argues that this is not an "obvious case" involving an unarmed nondangerous suspect. Appellant's Br. at 21. Because it is not an obvious case, Deputy Smiley argues, Driscoll must point to clearly established law showing that Deputy Smiley's "*specific* conduct was unlawful." Appellant's Br. at 22. Deputy Smiley argues that neither Driscoll nor the district court identified clearly established law that put her on notice that her conduct violated the law. Deputy Smiley distinguishes the case law offered by Driscoll and relied on by the district court, arguing that factual differences preclude reliance on those cases. Deputy Smiley also points out that *Palma v. Johns*, 27 F.4th 419 (6th Cir. 2022), a case relied on by Driscoll, was not decided until after the incident.

To establish that conduct violated clearly established law, courts must not define the law "at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Generalized statements of the law are insufficient to put officers on notice that their conduct is unlawful; rather, "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In an excessive force case like this one, the court must typically "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 580 U.S. at 79. However, the Supreme Court has held that "particularly egregious" circumstances can place "any reasonable officer" on notice of a constitutional violation. *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (finding a clearly established violation where the conditions of confinement were "particularly egregious," without looking for a factually similar case); *see also Hope v. Pelzer*, 536 U.S. 730, 745 (2002) ("The obvious cruelty inherent in [the practice of hitching prisoners] should have provided respondents with some notice that

their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment.").

Taking the facts in the light favorable to Driscoll, Deputy Smiley violated Driscoll's clearly established right not to be shot as an unarmed, nondangerous person, even though he was displaying erratic and noncompliant behavior and advancing toward Deputy Smiley. Indeed, "it is axiomatic that individuals have a clearly established right not to be shot absent 'probable cause to believe that [they] pose[ ] a threat of serious physical harm, either to the officer or to others.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005)). The Supreme Court clearly established as much in 1985, holding that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. Given the district court's determination that Driscoll was not dangerous and that any belief to the contrary was unreasonable, this is an obvious case. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("in an obvious case, [the general excessive force] standards can 'clearly establish' the answer, even without a body of relevant case law").[1]

Beyond these general statements of law, Driscoll's right not to be shot in in the specific circumstances facing Deputy Smiley was also clearly established. In *Martin v. City of Broadview Heights*, we held "[a] reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force." 712 F.3d at 963. The officers in *Martin* confronted a situation similar to the one encountered by Deputy Smiley—an unarmed man showing "conspicuous signs" of mental instability, refusing to comply with commands and speaking nonsensically. *Id.* at 962. This court found that the officer's use of compressive body weight strikes and restraints was unreasonable. *Id.* at 963. The dissent points out that, in *Martin*,

---

[1]The dissent questions how this could be an obvious case given that Deputy Smiley had no backup and that Driscoll appeared erratic, refused her commands, appeared unlikely to go into custody without a fight, and approached her. But neither the dissent nor Deputy Smiley points to facts in the record demonstrating that Driscoll was dangerous, rather than simply erratic. And officers cannot simply assume that all persons exhibiting mental-health issues are dangerous. Nor does the record provide any indication that Driscoll violated any law that would have entitled Deputy Smiley to take him into custody. Absent actual indications of his dangerousness, Smiley's use of deadly force was obviously unconstitutional.

the man was jogging away from officers, whereas Driscoll was approaching Deputy Smiley when she shot him. But in *Martin*, the man first ran toward the officers' patrol car speaking nonsensically, then asked to be taken to jail, then broke away from the officer who had grabbed his hands, and finally ran away. *Id.* at 959. In combination, these actions closely resemble Driscoll's erratic behavior. And like the officers in *Martin*, Deputy Smiley's escalation of the situation and ultimate use of deadly force was unreasonable. The dissent also points out that the type of force used in *Martin* differs from the type of force employed by Deputy Smiley. But because *Martin* put Deputy Smiley on notice that she could not use a lower level of force on Driscoll, *see id.* at 963, her use of greater force was clearly unreasonable under similar circumstances.

Other cases support this conclusion. In *Kent v. Oakland County*, we found that "a man who yelled at officers and refused to comply with commands to calm down, but was never told that he was under arrest, never demonstrated physical violence, and had his arms in the air and his back to the wall when tased—had a right to be free from the use of a taser." 810 F.3d 384, 397 (6th Cir. 2016). In that case, the man was yelling at officers to stop resuscitation of his father and refused to calm down. The court found the officer's use of a taser on the agitated but ultimately non-dangerous man to be unreasonable. *Id.* That decision put Deputy Smiley on notice that her use of a higher level of force here would be unreasonable when confronted with similar circumstances. In *Palma v. Johns*, we held that the right of an individual not to be shot was clearly established where the individual was mentally ill, noncompliant, and non-dangerous, but the officer had a "hunch" that the person might be armed. 27 F.4th at 443 (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007). As Deputy Smiley and the dissent point out, *Palma* was decided after the incident giving rise to this case and thus would not have placed Deputy Smiley on notice that her conduct was unlawful. Deputy Smiley thus did not have the benefit of *Palma*'s "synthesis" of our prior cases when she shot Driscoll. Dissent at 25. But we are nonetheless bound by *Palma*'s holding that the right not to be shot in such circumstances was clearly established in 2017, well before the incident in this case.[2] Finally, in *Goodwin v. City of*

---

[2]The dissent suggests that, "[a]t day's end, this case sits somewhere in between *Palma* (which found a constitutional violation) and *Mitchell* (which did not)," Dissent at 26, and that a reasonable officer in Deputy Smiley's position might understand our decision in *Mitchell* as permitting the use of force in this case. But as we

*Painesville*, we held that an officer's use of force was unreasonable when confronted with a noncompliant and disorderly person. 781 F.3d at 327. It does not matter that the plaintiff in *Goodwin* was drunk, while here Driscoll might have appeared intoxicated but was actually having a manic episode. The court in *Goodwin* found it unreasonable that the officer responded to mere noncompliance and disorderly actions and words with force. That holding placed Deputy Smiley on notice that it would be unreasonable to respond to Driscoll's noncompliant and erratic but ultimately unthreatening behavior with force.

Deputy Smiley resists this conclusion, arguing that, unlike these cases, she was confronting a suspect who "posed a threat of serious bodily harm by gasoline." Reply Br. at 15. In some circumstances, an individual's erratic behavior, accompanied by threats and a lethal object, may give officers sufficient justification for lethal force. *See Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019). But at the summary judgment stage, we view the facts in the light most favorable to Driscoll. And, as we have explained, Deputy Smiley has not offered undisputed facts suggesting that she reasonably believed Driscoll was carrying gasoline.

The dissent criticizes the district court for leaving the question of dangerousness to the jury, taking issue with the language in the district-court order indicating it "found a genuine dispute of material fact as to whether Driscoll was dangerous and whether Deputy Smiley reasonably believed Driscoll to have some sort of weapon." R. 39, Page ID 516. But understanding this language in context, the dissent's objection is largely semantic. The district court recited the facts in the light most favorable to Driscoll and concluded that those facts failed to show that Driscoll was dangerous and instead established that Deputy Smiley 1) needlessly escalated the interaction despite the absence of verbal or physical threats, 2) had no basis for drawing her gun, 3) had no basis for concluding that Driscoll had gasoline, and 4) should have perceived that Driscoll posed no threat. In so concluding, the district court properly applied the

explained earlier, the dissent's framing of *Mitchell* as analogous to this case is overly reliant on the respective officers' actions in the precise moment of a noncompliant person's approach. *See Barnes*, 605 U.S. at 76. The shooting in *Mitchell* occurred after Mitchell, who was already suspected of dangerous crimes, led police on a high-speed car chase in an attempt to evade arrest. *See* 864 F.3d at 421–22. Here, Deputy Smiley was responding to a call placed to a non-emergency line that indicated Driscoll was exhibiting strange behavior, and his conduct when she arrived was consistent with a mental-health issue, not dangerousness. A reasonable officer would recognize that the situation facing Deputy Smiley was plainly unlike the one involved in *Mitchell*.

summary-judgment standard, which calls for viewing the facts in the light favorable to the non-moving party. In context, the district court's holding that there was a genuine dispute as to "whether Deputy Smiley reasonably believed Driscoll to have some sort of weapon," R. 39, Page ID 516, properly applied the summary-judgment standard and was not an abdication of the qualified-immunity inquiry. A jury could ultimately credit Deputy Smiley's testimony that she was told Driscoll had gasoline, a fact that could change the dangerousness inquiry. On the other hand, the district court's analysis reflects that a reasonable jury could also find on this record that there was no indication that Driscoll possessed a weapon, given the lack of evidence of any smell of gasoline or any apparent adverse reaction on Driscoll's part when he drank copiously from the jug. In any event, the district court's characterization of the issues is not dispositive on our de novo review, even if that characterization may have been flawed as the dissent suggests.

## C. State Law Claims

Finally, Deputy Smiley seeks statutory immunity on Driscoll's state-law claims on the same bases as she seeks qualified immunity on his federal claims. The parties agree that the federal qualified immunity defense overlaps entirely with the state statutory immunity defense where the two concern the same factual circumstances. *See Hopper v. Phil Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) ("Defendants' statutory immunity defense stands or falls with their federal qualified immunity defense."). Because Deputy Smiley is not entitled to federal qualified immunity, she also is not entitled to state-law immunity.[3]

## IV. Conclusion

For the reasons stated, we AFFIRM the district court's order denying qualified immunity on Driscoll's excessive force claim and statutory immunity on his state-law claims.

---

[3]On appeal, Driscoll argues that, even if Deputy Smiley were entitled to qualified immunity on his federal excessive-force claim, she would not be entitled to state statutory immunity on Count VI, his state-law false-arrest claim. The district court treated Driscoll's federal and state claims, and the respective immunity inquiries, as fully overlapping. It relied on the parties' presentation of the claims at summary judgment. On appeal, Driscoll points out that his state false-arrest claim arises from Smiley's detention of him prior to the shooting, rather than the shooting itself. If the facts underlying Count VI differ from the facts underlying Driscoll's federal claim, the immunity inquiries would also be different. But as Deputy Smiley and the dissent point out, that distinction was not clearly articulated before the district court. Because we reject Deputy Smiley's qualified-immunity defense to Driscoll's federal claim, however, we need not address the possibility that Count VI could survive even if Deputy Smiley were granted qualified immunity on Driscoll's federal excessive-force claim. We note that Deputy Smiley does not separately address the substance of her immunity defense to the state-law false-arrest claim.

---

**DISSENT**

---

MURPHY, Circuit Judge, dissenting.  What would a reasonable officer have done when an erratic (yet unarmed) Cory Driscoll aggressively approached her in violation of her repeated orders to get on the ground?  Would the officer have continued to back up?  For how far?  Do the police have a duty to retreat?  Should the officer have instead stood her ground to see what Driscoll planned to do?  Do the police have a duty to take a punch before they may discharge a weapon?  Maybe the officer should have tried to swap out her gun for, say, pepper spray?  Do the police have a duty to risk a potential attack in the time that this exchange might take?  Or, like Deputy Jennifer Smiley, would the officer have shot Driscoll to stop him before he reached her?  Frankly, I remain unsure of the correct constitutional choice even after reviewing our many cases interpreting the Fourth Amendment.  So I would not expect Deputy Smiley to have known the correct choice in the seconds she had to respond to Driscoll's unpredictable, confrontational behavior.  I thus would grant Smiley qualified immunity because our precedent did not clearly establish that she violated the Fourth Amendment at the time she acted.  I respectfully dissent.

The Supreme Court has set clear qualified-immunity rules.  Plaintiffs who bring excessive-force claims against the police under 42 U.S.C. § 1983 must establish more than a violation of the Fourth Amendment.  They must also establish that the violation was so "clear that every reasonable" police officer would have recognized it.  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).  To show that type of violation, plaintiffs typically cannot frame the law "at a high-level of generality."  *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam) (quoting *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam)).  For example, the Supreme Court has long held that officers may not use deadly force unless they have probable cause that a person "poses a threat of serious physical harm" to themselves or others.  *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  But this rule often will leave unclear whether an officer's "specific use of force" exceeded constitutional

bounds under the governing totality-of-the-circumstances test.  *Kisela*, 584 U.S. at 105; *see Rivas-Villegas*, 595 U.S. at 5–6.

Plaintiffs thus must prove one of two things to make out a clearly established violation of *Garner*'s limitations on the use of deadly force.  They might show that the constitutional violation was "obvious" because the officer used the type of egregious force that everyone would have "immediately" described as excessive under *Garner*'s test.  *Rivas-Villegas*, 595 U.S. at 6 (citation omitted); *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted).  Otherwise, they "must identify a case" with sufficiently similar facts that it would have alerted the officer that the alleged conduct violated the Fourth Amendment.  *Rivas-Villegas*, 595 U.S. at 6.  This test "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 584 U.S. at 103 (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)).

Under this framework, we must decide on Deputy Smiley's request for immunity based on the specific "situation [she] confronted" on May 10, 2020.  *Mullenix*, 577 U.S. at 13 (quoting *Brosseau*, 577 U.S. at 13).  Begin with what she learned from dispatch over the radio or from her cruiser's computer.  Smiley Dec., R.22-1, PageID 104–05.  Driscoll had been acting unusually in a park, so concerned visitors called the police about him.  *See Driscoll v. Montgomery Cnty. Bd. of Comm'rs*, 2024 WL 4753243, at *1–2 (S.D. Ohio Nov. 12, 2024).  Dispatch alerted Smiley that Driscoll was "making a strange noise" and "might be on something" (such as illegal drugs). Rep., R.22-8, PageID 245.  Dispatch added that Driscoll had been "running [toward a] pond with a big water jug" and might have "a lighter inside [his] car[.]" *Id.*

Smiley arrived while Driscoll remained out of sight.  *See Driscoll*, 2024 WL 4753243, at *2.  She parked behind his car but could not read the faded numbers on his temporary license plate.  Smiley Statement, R.22-7, PageID 240.  She thus left her cruiser to obtain the car's VIN number.  *Id.*  In a statement, she said that an onlooker warned her that Driscoll might have gasoline.  *Id.*  But I agree with the district court that we must disregard this statement when considering the facts in the light most favorable to Driscoll.  *See Driscoll*, 2024 WL 4753243, at *9.  Still, all agree that Smiley told the bystanders to stay by their vehicle.  *See* Smiley Statement, R.22-7, PageID 240.

Driscoll soon walked back toward his car.  A bystander recorded the next four minutes with a cellphone.  As Driscoll emerged from the woods, he made unusual noises and held a jug in his hand.  Video, R.23, at 0:00–:18.  The jug contained a discolored liquid that turned out to be pond water.  *See Driscoll*, 2024 WL 4753243, at *2.  But Smiley believed that it contained gasoline.  *See id.*  She walked toward him and repeatedly told him to put the jug down.  Video, R.23, at 0:16–:31.  He made even louder noises in response.  *See Driscoll*, 2024 WL 4753243, at *2.  Driscoll soon threw the jug to the ground, held both arms out to his sides, and walked quickly at Smiley.  Video, R.23, at 0:33–:43.  This conduct led Smiley to retreat backward and draw her firearm.  *See id.*  Driscoll stopped a short distance from Smiley while continuing to make noises.  *See id.* at 0:43.

At this point, Smiley switched to telling Driscoll to get on the ground.  *See id.* at 0:44–1:15.  A noncompliant Driscoll made more noises.  *See id.*  After this impasse, he returned to the jug, picked it up, and drank from it a couple times.  *See id.* at 1:15–2:20.  Smiley alerted dispatch that Driscoll was drinking gasoline and requested a medic.  *Driscoll*, 2024 WL 4753243, at *2.  She continued to tell Driscoll to get on the ground, and he continued to ignore her command while making noises.  *See* Video, R.23, at 1:15–2:20.  Then, although Smiley had a gun trained on him, Driscoll told Smiley to "shoot me," dropped the jug, and took three steps toward her.  *Id.* at 2:20–:25.  Smiley refrained.  When Driscoll returned to the jug, he said "I'm drinking gasoline" in an "arguably inquisitory" way (and continued making noises).  *Driscoll*, 2024 WL 4753243, at *3.  Driscoll next yelled "come on" at Smiley several times.  *Id.* at 2:40–:48.  This conduct led Smiley to respond: "I don't want to fucking shoot you.  Get on the ground."  *Id.* at 2:46–:49.  Interspersed with more noises, Driscoll asked: "Why do I got to get on the ground?"  *Id.* at 2:50–:58.  She responded: "I'm telling you to get on the ground."  *Id.* at 2:58–:59.  Driscoll asked again: "Why?"  *Id.* at 3:00.  Smiley again replied: "Because I'm ordering you to.  On the ground."  *Id.* at 3:01–:03.  In response to additional commands to get on the ground, Driscoll answered "no."  *Id.* at 3:12.  He then began to repeat the phrase "the blood of Jesus" over and over.  *Id.* at 3:22–:30.

The encounter ended seconds later.  Smiley warned Driscoll: "If you take one step toward me, I'm going to fucking shoot you."  *Id.* at 3:31–:34.  Driscoll responded "shoot me then,"

dropped the jug, and took two and a half large steps toward Smiley. *Id*. at 3:34–:37. At this point, he was within "a few feet" of her and showed no signs of stopping. *Driscoll*, 2024 WL 4753243, at *9. So Smiley shot him once to prevent him from getting closer. Video, R.23, at 3:35.

Did this shot qualify as an "unreasonable . . . seizure[]" under the Fourth Amendment? U.S. Const. amend. IV. In my view, it sits somewhere on the "hazy border between excessive and acceptable force" and thus should trigger qualified immunity. *Kisela*, 584 U.S. at 105 (quoting *Mullenix*, 577 U.S. at 18). Recall that Smiley could shoot Driscoll only if she had "probable cause to believe that" Driscoll "pose[d] a threat of serious physical harm" to herself or the bystanders. *Garner*, 471 U.S. at 11. And I "cannot say that only someone 'plainly incompetent' or 'who knowingly violate[d] the law' would have perceived a sufficient threat and acted as [Smiley] did." *Mullenix*, 577 U.S. at 15 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To start, I find it far from "obvious" that *Garner*'s deadly force test prohibited Smiley from shooting Driscoll to stop him from approaching her further. *Rivas-Villegas*, 595 U.S. at 6. True, Driscoll did not have a gun, a knife, or even a hammer. *Cf. City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) (per curiam); *Kisela*, 584 U.S. at 105–06. And true, we must find at this stage of the proceedings that nobody told Smiley that Driscoll might have had gasoline that he could use to light himself (and Smiley) on fire. *Cf. Tolan v. Cotton*, 572 U.S. 650, 657–58 (2014) (per curiam). Still, other facts would lead a reasonable person to believe that Smiley remained in a precarious position. She had no backup during the encounter and so had to confront Driscoll by herself. Driscoll's erratic behavior also could have led her to believe that he was under the influence of illegal drugs that might lower his inhibitions toward violence. Indeed, even Driscoll admitted that he "no longer had control" of his actions when he approached Smiley. Driscoll Aff., R.29-1, PageID 306. Driscoll also repeatedly refused Smiley's commands to get on the ground and defiantly told her "no." Video, R.23, at 3:12. Driscoll's other actions would have confirmed he might be a threat. His initial steps toward Smiley led her to draw her firearm. He said "shoot me" and "come on" more than once—statements that could lead a reasonable officer

to believe he would not go into custody without a fight.  Lastly, he had aggressively stepped to within "just a few feet" of Smiley when she shot him.  *Driscoll*, 2024 WL 4753243, at *9.

What was Smiley supposed to do at this point?  Retreat further?  Wait another second or two until Driscoll was within striking distance?  Switch to a less deadly weapon even though Driscoll could have tackled her in the interim?  I am not sure what the right answer is.  Yet Smiley's choice at this "precise time" is likely "what matters most" to the Fourth Amendment analysis in this case.  *Barnes v. Felix*, 605 U.S. 73, 80 (2025).  And I am sure that Smiley was not "plainly incompetent" to fear Driscoll and view him as a serious "threat" to her safety at this time.  *Mullenix*, 577 U.S. at 15.  I certainly would have feared Driscoll if I were in her shoes.  This case thus does not qualify as an "obvious" one in which *Garner*'s rule alone suffices to show a clearly established violation of the Fourth Amendment.  *Rivas-Villegas*, 595 U.S. at 6.

Driscoll instead "must identify a case" that would have alerted Smiley that she could not shoot him when he quickly approached her.  *Id.*  But I do not see any "existing precedent" placing it "beyond debate" that Smiley misidentified the threat.  *Mullenix*, 577 U.S. at 12 (citation omitted).  If anything, at least one "of our opinions may be read as pointing in the opposite direction."  *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (per curiam); *see Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017).  In *Mitchell*, an intoxicated suspect allegedly assaulted another person and led a police officer on a high-speed chase.  *See* 864 F.3d at 419.  After the suspect crashed into a ditch, the officer parked his cruiser over 60 feet away and approached on foot.  *See id.*  The unarmed suspect exited the crashed car, "headed straight toward" the officer "with long, purposeful steps," told the officer to "shoot him," and ignored the officer's commands to stop.  The officer shot the suspect when he was 10 to 21 feet away.  *See id.*  We held that the officer's conduct did not violate the Fourth Amendment because he "reasonably believed that he was in danger of serious physical harm" from the suspect.  *Id.* at 422.  While one might distinguish *Mitchell* in various ways, the suspect's charge in that case resembles Driscoll's approach of Smiley.  Both individuals disobeyed orders to stop, moved quickly toward the officer, and suggested that the officer should shoot them.  And unlike the suspect in *Mitchell*, Driscoll was only a few feet from Smiley when she fired.

For his part, Driscoll identifies three cases that find clearly established Fourth Amendment violations. *See Heeter v. Bowers*, 99 F.4th 900, 910 (6th Cir. 2024); *Palma v. Johns*, 27 F.4th 419, 438 (6th Cir. 2022); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005). But two of these cases—*Heeter* and *Palma*—"postdate" Smiley's actions and thus cannot "clearly establish anything" about those actions. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 927 (6th Cir. 2024). To be sure, those cases found violations of clearly established law from conduct that occurred in 2017 and 2018. *See Heeter*, 99 F.4th at 915; *Palma*, 27 F.4th at 424. Yet Deputy Smiley did not have the benefit of *Heeter*'s or *Palma*'s synthesis of our prior cases on May 10, 2020. Whenever a new case finds a Fourth Amendment violation, it clarifies the law in a way that was previously unavailable to law enforcement. We cannot expect police officers to read the tea leaves of our past cases and predict how our future opinions will come out before we write them. Driscoll could have borrowed the pre-2020 cases cited in *Heeter* and *Palma*, but he cannot rely on their fact patterns to show clearly established law. Regardless, none "'squarely governs' the specific facts" of this case, so these decisions cannot overcome Smiley's qualified-immunity defense. *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13).

Start with Driscoll's reliance on *Sample*. There, a burglar ran from the officers who spotted him while responding to an in-progress burglary. *See* 409 F.3d at 691. The officers later discovered the burglar hiding in a cabinet and told him to exit with his "hands out." *Id.* at 693. Yet when the burglar attempted to follow these instructions by reaching for "the top of the cabinet to pull himself out," the officers allegedly shot him. *Id.* Although we held that this shooting violated clearly established law, *see id.* at 698–701, these facts "are dramatically different" from the facts that Smiley faced, *City of Tahlequah*, 595 U.S. at 13. Unlike the burglar in *Sample*, Driscoll disobeyed Smiley's instructions by walking right at her and telling her to shoot him.

Turn to Driscoll's reliance on *Heeter*. Appellee's Br. 40. In that case, the police responded to a call that a man "was armed, suicidal, and sitting in his dining room." 99 F.4th at 905. After a standoff, the man made a slight movement. *Id.* at 906. This movement led an officer to shoot him. *Id.* We held that "any officer would have known it violated the

Constitution to shoot a suicidal individual that had moved slightly, even if the person held a gun in their pocket or could grab a gun within reach." *Id.* at 915. Would that precise rule alert "every reasonable" officer that Smiley's conduct was also unlawful? *Mullenix*, 577 U.S. at 11 (citation omitted). Hardly. Both cases involved men with mental illnesses, but the similarities end there. Heeter "largely remained silent" and "moved slightly" before the shooting. *Heeter*, 99 F.4th at 906. Driscoll walked right at Smiley while saying "shoot me then." Video, R.23, at 03:34–:37. In short, the conclusion that Smiley could not use deadly force does not "follow immediately from" *Heeter*, so that decision cannot overcome Smiley's qualified-immunity defense. *Mullenix*, 577 U.S. at 13 (citation modified).

Admittedly, *Palma* provides the best case for Driscoll. Appellee's Br. 40–41. The officer there shot a mentally ill man while responding to a "family dispute over a television remote." *Palma*, 27 F.4th at 423. The officer shot the man when the man continued to walk toward the officer in disregard of commands to stop. *Id.* at 425. Yet the man was "silent throughout the entire encounter," "never verbally threatened" the officer, and made no "physically threatening gestures" toward him. *Id.* at 424, 434. We thus held that this shooting violated clearly established law. *See id.* at 442–44. Still, *Palma* used a "hyper-segment[ed]" approach to evaluate the encounter—one that the Supreme Court has since abrogated. *See Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 610–11 (6th Cir. 2025) (discussing *Barnes v. Felix*, 605 U.S. 73 (2025)). If unpublished decisions cannot clearly establish the law for qualified-immunity purposes, I doubt that abrogated decisions may do so. *Cf. Campbell v. Riahi*, 109 F.4th 854, 861 (6th Cir. 2024). And besides, our decision rested on a critical fact absent here: the man "never got within ten to fifteen feet" of the officer. *Palma*, 27 F.4th at 440. In this case, by contrast, the video establishes that Driscoll was just a few steps away from Smiley and showed no signs of stopping. Unlike the man in *Palma*, Driscoll had also made aggressive statements (such as "shoot me" and "come on").

At day's end, this case sits somewhere in between *Palma* (which found a constitutional violation) and *Mitchell* (which did not). Should we really expect police officers to behave like appellate lawyers in an oral argument by debating whether their facts are more like *Mitchell* or more like *Palma* in the seconds that the officers must decide on the force to use? No, qualified

immunity exists for fact patterns (like the fact pattern here) that sit on the jurisprudential borderline separating legal from illegal force. *See Kisela*, 584 U.S. at 105. Smiley could not have "read" *Palma* and *Mitchell* and "know[n]" that they "proscribed" her "specific conduct." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (citation omitted).

The district court's contrary conclusion rested on a mistake of law. It believed that a jury should resolve the question "whether Driscoll was dangerous" in addition to the disputed questions of historical fact (such as whether a bystander told Smiley that Driscoll had gasoline). *Driscoll*, 2024 WL 4753243, at *10. But once we interpret the historical facts in Driscoll's favor, the ultimate question whether those facts showed a sufficient danger to give Smiley probable cause to use deadly force belongs to the *court*—not the *jury*. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *see also Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020). To be fair, the district court's mistaken treatment of a question of law as one of fact represents a common problem. *See, e.g.*, *Hoover v. Due*, 152 F.4th 749, 764–67 (6th Cir. 2025) (Murphy, J., concurring); *Clark v. Louisville-Jefferson Cnty. Metro. Gov't*, 130 F.4th 571, 587–89 (6th Cir. 2025) (Murphy, J., concurring); *Browning v. Edmonson County*, 18 F.4th 516, 540 (6th Cir. 2021) (Murphy, J., concurring in part and dissenting in part). Here, as elsewhere, this approach effectively deprives officers of their qualified-immunity protections. *Cf. Hoover*, 152 F.4th at 766 (Murphy, J., concurring). By treating the question whether Driscoll posed a danger as a question of fact, the district court could take this "fact" in the light most favorable to Driscoll and simply assume that he was *not* a danger. *See Driscoll*, 2024 WL 4753243, at *10. This step allowed the district court to claim that Smiley violated clearly established law *under Driscoll's version of the facts* because the Supreme Court has long held that suspects have a right to avoid deadly force unless they pose a danger. *See id.* The court's framing thus allowed it to define the identified right at a higher level of generality than we would otherwise permit. *See Rivas-Villegas*, 595 U.S. at 6; *City of Escondido*, 586 U.S. at 43; *Kisela*, 584 U.S. at 105. And if we treat this question as one of law (as we should), Driscoll would have to cite a case in which we held that a person who engaged in similar conduct did not qualify as a "sufficient threat" to justify deadly force. *Mullenix*, 577 U.S. at 15. He has not done so.

My colleagues, by comparison, conclude that Driscoll's non-dangerousness was so "obvious" that he need not identify a case with similar facts to rebut Smiley's qualified-immunity defense.  Maj. Op. 16 (quoting *Brosseau*, 543 U.S. at 199).  I puzzle at how the majority can conclude that Smiley *obviously* "had no reason to think [Driscoll] was dangerous" when they agree that he was "erratic and noncompliant," suffering from a "manic episode" that left him "no longer [in] control," and "advancing toward Deputy Smiley" in an "alarming" way.  Maj. Op. at 3, 7, 10, 16.  The "unlawfulness" of Smiley's conclusion that Driscoll posed a threat "does not follow immediately" from *Garner*'s overarching test for the use of deadly force.  *Wesby*, 583 U.S. at 64 (citation omitted).  So that test "is too general" to clearly establish a violation here.  *Id.*

Indeed, how can we describe this case as an obvious one when we must scrutinize every detail of the fact-intensive records in *Palma* and *Mitchell* to determine which case is closer?  My colleagues say this case resembles *Palma* more than *Mitchell* because Driscoll "did not charge Deputy Smiley with fists clenched; rather, he walked forward with arms open and empty."  Maj. Op. 10.  As we have said before, however, the "semantic difference between 'charging' and 'moving quickly toward' is immaterial."  *Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009).  And whether Driscoll's fists were clenched or his arms open, he could still "have tried to wrestle for control of [Smiley's] gun" in the second or so that he would have reached her.  *Mitchell*, 864 F.3d at 423.  Although I agree that *Mitchell* does not control, its facts are just as close to this case as the facts in any other decision that Driscoll cites.

My colleagues thus turn to *other* cases that Driscoll did not cite (or cited only in passing).  But those cases are also "materially distinguishable" and so do not show that Smiley's "specific conduct was unlawful."  *Rivas-Villegas*, 595 U.S. at 6.  The majority first relies on *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013).  There, three officers chased down, tackled, beat, and restrained a naked mentally ill man after he "jogged away" from them.  *Id.* at 954–55.  When restraining the man, the officers placed so much pressure on him that he suffocated and died.  *Id.* at 955–56.  We held that they violated clearly established law by doing so.  *See id.* at 960–62.  Here, by contrast, Smiley was alone with Driscoll advancing toward (not away from)

her. In all events, this case does not even involve the type of force—the creation of "asphyxiating conditions"—that *Martin* addressed. *Id.* at 961. So I find it marginally relevant.

The majority's other two cases, *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016), and *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015), are even further afield. In *Kent*, an officer tasered a physician in his home after he became upset that EMTs were trying to resuscitate his deceased father against his father's wishes. 810 F.3d at 387–88. Yet the physician did not approach the officer in an aggressive manner and instead "had his hands up and his back against the bedroom wall when he was tased." *Id.* at 391. As for *Goodwin*, an officer tasered a man for an "atypically long" time after the man refused to step out of his apartment at the officer's request. 781 F.3d at 324. But the man desired to stay *away* from the officers, and they responded by using a taser for much longer than needed to incapacitate him. *See id.* at 325–28. "Suffice it to say," Smiley "could miss the connection between [those cases] and this one." *City of Tahlequah*, 595 U.S. at 14.

I am under no illusion that Smiley handled this incident flawlessly. Perhaps she could have done a better job trying to deescalate things. But the district court recognized that she "was forced to act quickly," *Driscoll*, 2024 WL 4753243, at *9, and my colleagues recognize that "she faced a difficult situation," Maj. Op. 13. Qualified immunity exists for these types of stressful situations in which officers could reasonably misinterpret the law. *See Mullenix*, 577 U.S. at 18.

\* \* \*

This conclusion leaves Driscoll's state-law claims. In the district court, Driscoll conceded that these claims *all* would "stand or fall with [Smiley's] federal qualified immunity defense." Resp., R.29, PageID 302 (quoting *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018)). So my conclusion that qualified immunity protects Smiley suffices to resolve the state-law claims too.

On appeal, however, Driscoll now argues that his false-arrest claim under Ohio law might survive even if we grant Smiley qualified immunity on his federal excessive-force claim. Appellee's Br. 44. He may have a point. But we need not resolve this claim on the merits. Rather, Driscoll forfeited the claim by "belatedly" raising it for the first time "on appeal" without

asserting "it in the district court." *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022). And he does not identify any exceptional circumstances that might excuse this forfeiture. *See id.* at 1012. To the contrary, Driscoll devotes all of three sentences to this argument even on appeal. I thus would hold Driscoll to his forfeiture and grant Smiley immunity on his false-arrest claim.

I respectfully dissent.